WILLIAMSON ET AL. v. THE C., R. I. & P. R. Co.

1. **Contract:** RAILROADS: PUBLIC POLICY. The plaintiffs procured the conveyance, to the defendant, of certain lots in the city of Des Moines upon consideration of a promise by defendant that it would build thereon passenger and freight depots, which should be the only ones built or maintained by it in said city. Defendant built, and has since maintained, both passenger and freight depots thereon, but having also built a depot in another part of the city, an action was brought by plaintiffs to recover, as damages, the value of the lots conveyed: *Held*, that such action was based upon the contract, which was illegal and void as against public policy, and, the parties being in *pari delicto*, the action could not be maintained.

*Appeal from Dallas District Court.*

THURSDAY, MARCH 18.

THE petition of the plaintiffs was filed on the 5th day of June, 1875, and, in substance, alleges that the plaintiffs, James A. Williamson, Samuel P. Ives, and George W. Jones, in their own behalf, and for the benefit of divers other persons, who are so numerous that it is impracticable to bring them all before the court, claim of the defendant the sum of $40,000, and for cause of such claim allege that in June, 1867, the defendant proposed to contract with the plaintiffs that if plaintiffs would furnish the money, purchase and deed to the defendant twenty-one lots which were designated by the defendant, in the city of Des Moines, known as East Des Moines, making a sufficient plat of ground for the defendant's depots, side tracks, switches and transfer grounds, the defendant, in consideration thereof, would build all its depots, both passenger and freight, which it might or would build in the said city of Des Moines, on the east side of the Des Moines river in the said East Des Moines, and on the lots so transferred and conveyed to defendant.

As an inducement to the plaintiffs and others to enter into said contract, the defendant represented to them that the said

depots would be very large, fine structures, would require the outlay of a great deal of capital in East Des Moines, and that it would be such a vast improvement to that part of the city as to greatly enhance the value of the city property therein, and enrich the owners and holders of property in the vicinity thereof. In view of the representations and inducements thus held out to them, the plaintiffs accepted said proposition upon the terms offered by defendant, and they and the other persons for whose benefit this suit is instituted, being residents and property holders in East Des Moines, and believing that said depots would be a great improvement to that part of the city of Des Moines, and that they would be greatly benefited thereby, were induced to spend a great deal of valuable time, and incur a large amount of expense in circulating subscriptions and obtaining money with which to purchase lots and in getting the same conveyed to defendant; that they raised and furnished the sum of about $15,000, and expended it in purchasing, conveying, and procuring to be conveyed to the defendant, twenty-one lots in East Des Moines, which were accepted by the defendant under and in virtue of the express contract with the plaintiffs that the depots of the defendant, both freight and passenger, and the only depots that the defendant would build or have in the city of Des Moines, should be located and built on the said lots in East Des Moines, and which the defendant has ever since held, occupied and used for its freight depots, side tracks, switches, etc., in and about the operation of its road; that the said city lots were worth the sum of $25,000, but in view of the fact that the owners thereof were the owners of other city property near thereto, which they knew would be greatly enhanced in value by the location of the depots on said lots, they consented to sell, and have the same conveyed to the defendant for much less than their real value; that the defendant, continuing to cheat and defraud the plaintiffs and the other persons for whom this suit is instituted, and obtain from them a large amount of property, did make the said

false and fraudulent representations, and hold out. the said false and fraudulent inducements to the people and property holders of East Des Moines; that plaintiffs had no knowledge that the said inducements, promises and contracts of the defendant were false and fraudulent until within the last year, when the defendant began to make preparations to build its depots on the west side of the Des Moines river, in what is known as West Des Moines; that some time after the contract was made the defendant constructed a small building on part of the property in East Des Moines, which has been used as a temporary depot, at which only a part of the trains on said road have made any stop, and. these only for a few minutes at a time, and for special and temporary purposes; that defendant, for a long time after the occupation of said lots and the building of said temporary depot, gave out' in speeches, and held out inducements, and encouraged the plaintiffs and others to believe that they were still going to build their permanent depot on the said lots in East Des Moines, and that they would not build one any where else in the city of Des Moines, but that the defendant, intending to cheat and defraud the plaintiffs and the other persons for whose benefit this suit is brought, still fails and refuses to comply with the contract, by building its permanent depot on the east side of the Des Moines river, and instead thereof, without surrendering the money or property obtained from the plaintiffs and others, in violation of its contract and the plaintiffs' rights, the defendant proposes, and has already commenced, to build its permanent and chief passenger depot in West Des Moines, and has elected to violate its contract and abandon the building of said depot on the east side of the Des Moines river. Petitioners represent that they are damaged in the money contributed, and the conveyance of said. lots, and the time and labor spent, and the depreciation of the value of their property, in the aggregate sum of $40,000, for which they ask judgment.

Afterward the plaintiffs filed an amendment to their peti-

tion, alleging that the contract was in parol, and made with the defendant by plaintiffs in their own behalf and in the behalf, and for the benefit, of the divers other persons referred to in the petition; that, in addition to said contract as set up, for the consideration in said petition stated, defendant agreed to make East Des Moines a division line on its railway, and to erect and operate on said lots large, costly, and permanent machine shops, which said promise and agreements defendant has wholly neglected to keep and perform.

The defendant filed an answer as follows:

1. Denies each and every allegation of the petition.

2. Alleges that the cause of action set out in plaintiff's petition accrued to them, if at all, more than five years prior to the commencement of this action.

3. That at the date of the alleged contract with plaintiffs defendant was engaged in constructing a line of railroad westward, and by the way of the city of Des Moines, to the Missouri river, and at said date its said line of railroad was, or was about to be, completed as far as the east side of the Des Moines river, in the corporate limits of the city of Des Moines. That until the completion of a bridge across said Des Moines river, a task requiring time, defendant could not proceed with its trains beyond the east side of the said river. That being desirous of securing grounds upon which to erect a depot and freight house, and upon which to lay and maintain the requisite tracks and side-tracks, and certain citizens of East Des Moines being desirous that a depot should be located on the east side of the river, it was agreed that said citizens, among whom were the plaintiffs, should procure to be conveyed to the defendant the lots named in plaintiffs' petition, and that upon these defendant would locate and erect a passenger depot, freight house, and such side-tracks and other buildings as should be found necessary to accommodate the demands of business.

That at said date the city of Des Moines embraced territory four miles long east and west, and two miles wide, north and

south, which said territory then was and still continues to be divided into three unequal parts, by the passage through the same of the Des Moines and Raccoon rivers, which said streams were then and still are, during large portions of each year, only passable by means of bridges or ferries. That at said date said several portions of said city were more or less populously inhabited, that portion lying north of the Raccoon river and west of the Des Moines river being then and ever since much the most populous, and containing then and ever since the court-house of the county of Polk, all the county offices of said county, and the city post-office; and within said territory was and ever since has been the largest portion of the trading and other business done in said city. That on the completion of defendant's bridge across said Des Moines river defendant began running its trains westward through the western portion of said city. That immediately thereafter the demands of public travel and convenience called for depot accommodations on the west side of the Des Moines river, in said city of Des Moines, and efforts were made by persons living on the west side of said river, and in said city, for such accommodations, and in response thereto, and about the year 1868, the defendant established and ever since has maintained a station and depot of its road west of said river and in said city, discharging passengers thereat, and receiving them therefrom, all of which plaintiffs well knew more than five years prior to the commencement of this action.

That defendant has continued to and now does maintain east of said river in said city, and upon said lots described in said petition, a passenger depot sufficient to accommodate all ordinary travel coming thereto, and has maintained and now maintains on said lots a freight house, with the usual and necessary side-tracks, at which house defendant does all its freight business done in said city. That defendant in establishing said depot east of said river did so to accommodate public travel and convenience, and then expected and still expects to maintain the same so long as public travel and convenience

demand, and from time to time to adapt it thereto, as occasion may require.

That defendant agreed to nothing more than that, and made no representations such as are in said petition alleged. That defendant has expended upon said lots a large amount of money, to-wit: the sum of about thirty thousand dollars, the proceeds whereof are now upon said lots, and constitute the improvements thus far by defendant made in pursuance of the agreement made by it when said lots were conveyed to it.

4. For further answer defendant says plaintiffs ought not to have and maintain this action, for that they, said plaintiffs and those for whom they pretend to sue, have no joint or common interest in said cause of action, but are separately and individually interested therein.

5. That at the date of said alleged contract, ever since and still, the relative locations of the different portions of the city of Des Moines, the situation of the public buildings and offices in said city, and the peculiar division of the business and population of said city, rendered necessary more than one depot in said city, and made inconvenient one depot therein. That at the date of said alleged contract, ever since and still, the location of one depot in the city, to the exclusion of all others, would cotravene the convenience and necessities of public travel, and a contract for such exclusive location was and is illegal, and against public policy."

The plaintiffs filed a motion to strike out the third count of the defendant's answer, for the reason that it is redundant, irrelevant and immaterial, and does not traverse, avoid, or set up any defense to plaintiffs' cause of action. The court sustained this motion, to which the defendant excepted. The plaintiffs demurred to the fifth count of the defendant's answer. The demurrer was sustained, to which ruling the defendant excepted.

The plaintiffs replied denying the allegations of the answer, and alleging that, if their cause of action did accrue more than five years next prior to the commencement of the action, plaintiffs had no knowledge thereof, and defendant fraudulently

concealed that fact from plaintiffs.    There was a jury trial and
a verdict and judgment for plaintiffs for $30,973.33.    The
defendant appeals.

*Wright, Gatch & Wright*, for appellant.

*H. W. Maxwell* and *P. Gad Bryan*, for appellees.

DAY, J.—The petition alleges that in consideration of the
conveyance of the lots in question, the defendant proposed to
1. CONTRACT: contract to "build all its depots, both passenger
railroads:
public policy. and freight, which it might or would build in
the said city of Des Moines, on the east side of the Des
Moines river, in the said East Des Moines; and on the lots
so transferred and conveyed to it," and that "the plaintiffs
agreed to and accepted the said proposition upon the terms
offered by the defendant." The petition further alleges that
"the defendant for a long time after the occupation of said
lots, and the building of said temporary depot, gave out in
speeches and held out inducements, and encouraged the plain-
tiffs to believe that they were still going to build their per-
manent depot on the said lots in the said East Des Moines,
and that they would not build one any where else in the city
of Des Moines," but that the defendant "does fail and refuse
to comply with the said contract or any part thereof, by build-
ing its permanent and only depot on the said lots on the east
side of the Des Moines river, as it had contracted to do," and
instead thereof proposes to, and has already commenced to
build its permanent and chief passenger depot on the west
side of the Des Moines river in West Des Moines." The
plaintiffs allege that by "the willful, wrong and fraudulent
representations, and violations of said contract by the defend-
ant, they are damaged in the money contributed by them, and
the conveyance of said lots to the defendant, and the time and
labor expended in the same, and the depreciation of the value
of their property, in the aggregate sum of forty thousand dol-
lars." The evidence is in entire harmony with these allega-

tions of the petition. Geo. W. Jones, one of the plaintiffs, testifies: "Dr. Brooks, one of the committee said: 'If we procure these grounds, are they to be the only depots to be made, freight and passenger, or are there to be depots on the other side? If so we would not give twenty-five cents; but if you will locate the depots, and the only depots in the city, on the grounds, then we will go to work.' Mr. Hall said: 'We never build but one depot in any one city, and we will not do so here. If you procure satisfactory grounds, and transfer them to us, you will have the permanent and only depot of this company.' This was repeated and had the assent of Mr. Johnson. An estimate of cost was made, and we agreed that, if they would pay $5,000, we would pay the balance." On cross-examination this witness said: "This proposition was that if we would convey, or have conveyed, to the company these lots, they would erect thereon their permanent and only depot in the city of Des Moines, and this was the only inducement for us to procure the lots. * * * . In consideration of these agreements and promises made by Mr. Hall and Mr. Withrow, and the further averment and statement made by Mr. Hall that so long as he lived, or retained his position in the company (the depot) should be maintained and kept on said grounds, and nowhere else in the city of Des Moines, the title papers to grounds were delivered by me, in behalf of the committee, to Mr. Withrow, attorney of the railroad company."

M. D. McHenry testified as follows: "I was notified we should meet at Mr. Ives' office to have an interview with persons representing the railroad company. These persons stated that they wanted to get grounds upon which to locate their passenger and freight depots and other works, and for all their works which they were going to locate in Des Moines. That the West Side people treated them coolly, and they wanted to see what arrangement could be made with us, alluding to some conversations that they had previously with some of the gentlemen from the East Side. They wanted to get twenty

one lots which they described, and wanted to know what we would do. They said they would give $5,000, and put it in such shape as to be used by our sub-committee in making purchases, and would pledge us their most positive assurance that their purpose was the final, ultimate, and perpetual location of the depots of the company on these grounds. I know one of us suggested the idea named in connection with Dr. Brooks to-day, that if there was to be a depot on the West Side as well as on the East it would not avail us anything. We wanted the business that the road should transact on our side of the river, and the enhanced value of the property. They promptly replied that they made but one depot in a place. They were not satisfied with the way they were treated on the West Side, and if we gave them these lots their principal and important depot should be established on these lots, and they would make none on the West Side. We got them the property, and they have used it from that day to this, or shortly afterwards."

J. W. Cattell testified as follows: " Gen. Williamson stated the contract like this: 'That the company proposed to give, toward purchasing the lots that they wanted, $5,000, and if the citizens would contribute the balance of the funds they would take that ground of twenty-one lots and establish their depot there, and it should be their only depot in the city— their main depot, their buildings and works.' There was no dissent to this by any one."

S. P. Ives testified as follows: " The agreement was this: We were to furnish the company twenty-one lots, for which the company were to allow us, in the purchase, $5,000, and agreed to build upon the lots their only buildings, including round-house, freight and passenger houses, and maintain them permanently. The question was raised by Dr. Brooks whether they would not build two depots in the city. They said it was something they never did. They sometimes had what was called an office, but they would have nothing of the kind in this city. They spoke of the possibility of this being

made the end of a division, in which event their machine shops would be here. The committee then went to work, and secured these lots after much hard labor."

J. O. Skinner testified as follows: "The offer was made by the railroad officers, that for the land desired for depot purposes they would pay $5,000, if the citizens would pay the balance. This was talked over and agreed to by the committee. Dr. Brooks then suggested that it be reduced to writing. Mr. Hall said that was unnecessary, that they were then negotiating for a large and commodious brick building to go on the lots, and that this would be better security than anything they could put on paper; that they intended to have a depot there and no place else in the city. After some other words they agreed this was their bargain, and that they would go to work and raise the money." The evidence showed that the defendants erected, and that they now maintain on the lots in question, a wooden depot building, at which all the day trains stop.

It is evident, both from the allegations of the petition and the evidence submitted in support of it, that the contract which the plaintiffs claim the defendant made was that it would erect a passenger depot in East Des Moines, and would erect no passenger depot in West Des Moines, and that the substantial cause of the plaintiffs' complaint is, not that the defendant has failed to construct a depot on the east side of Des Moines river, but that it has constructed a depot on the west side of the Des Moines river. The evidence shows very clearly "that the business, commerce, trade, and necessities of the city of Des Moines" demand, and have demanded from the time the road crossed the river, a depot on the west side of the river. The important question in this case, and the one which we think is decisive of it, is this: Is the contract in question valid, so that damages may be recovered for a breach of it, or is it void as against public policy?

In the case of the *Jacksonville & Chicago R. R. Co. v. Mathers*, 71 Ill., 592, it was alleged that Mathers conveyed

two hundred lots in the town of Ashland to trustees for a railroad company, on condition that it should build no station within three miles of Ashland. Upon the breach of this condition Mathers commenced an action to compel a re-conveyance of the property. In the court below the relief asked was granted. The Supreme Court, reversing this judgment, said: "The alleged agreement or condition, on account of the non-performance of which relief is here sought, was that a railroad company, chartered by an act of the legislature, and invested with the power of condemning private property upon the ground that its road is for the public use, shall not establish a depot or station within three miles of Ashland. It cannot be pretended for a moment that the board of directors had authority to make such an arrangement or condition. They were trustees both for the public and the stockholders of the company, and, in the discharge of their two-fold duty, were required to act with reference to the public convenience on one hand, and the private interests of the stockholders upon the other. The interests, * * both of the stockholders and the public, forbid that there should be a positive prohibition against the establishing of stations at any points on the line of the road. Whenever the public commerce requires that a station on a railroad should be established at a particular place, and it can be done without detriment to the interests of the stockholders of the company, the law authorizes it to be established, and no contract between a board of directors and individuals can be allowed to prohibit it. * * Appellee stands in *pari delicto* with the board of directors, so far as this agreement or condition is concerned. He voluntarily, according to his own showing, contracted for the breach of trust toward the stockholders of the railroad company, and breach of duty to the public at large. Their loss was his gain. He was willing, at whatever expense it might be to others, to purchase a monopoly whereby to enrich himself, and, having failed to accomplish his purpose, now asks a court of equity to reinstate him in the condition

he was before entering into this unlawful combination. The case presents no facts or circumstances meriting the consideration of a court of equity."

In *St. Joseph & Denver City R. R. Co. v. Ryan*, 11 Kansas, 602, an action was brought by a land-owner for the breach of a written contract in which the company agreed to place a depot on land conveyed to it by the plaintiff, and not at any other time to have or use any other depot within three miles of said depot.    The plaintiff recovered $6,500 damages. Reversing this judgment the Supreme Court said: "Railroad corporations are, as we have seen, public agencies, and perform a public duty.    They are agencies created by the public with certain privileges and subject to certain obligations. A contract that they will not discharge or by which they cannot discharge those obligations, is a breach of that public duty, and cannot be enforced    *    *    *    *.    It is the duty of a railroad company to furnish reasonable depot facilities. The number and location of the depots so as to constitute reasonable depot facilities vary with the changes and amount of population and business.    A contract to leave a certain distance along the line of the road destitute of depots is in contravention of public policy."    Some courts have gone much beyond the doctrine of these cases and have held that an agreement between an individual and a railroad company for the location of a depot at a particular place, in consideration of money or property, is against public policy and void.    See *The P. R. R. Co. v. Seeley*, 45 Mo., 212; *Marsh v. Fauling*, 64 Ill., 414; *Bestor v. Walters*, 60 Ill., 138; *Fuller v. Dume*, 18 Pick, 472; *Halladay v. Patterson*, 5 Oregon, 177. Whilst we may not feel like going to the extent of this doctrine (*First National Bank of Cedar Rapids v. Hendrie*, 49 Iowa, 402), still we feel quite clear that where the contract is coupled with the condition that no depot shall be constructed at a particular place, or within a specified distance, the contract is void as against public policy, and a breach of it cannot be made the foundation of an action.    We have found no case in which

such a contract has been held to be valid.    In *Southard v. Central R. R. Co.*, 2 Dutcher, 13, relied on by the appellees, the plaintiff conveyed to the defendant certain real estate to be occupied by the defendant for the sole use of depots and other necessary buildings for the accommodation of said company upon the condition that if it was used for any other purpose, or if the defendant should use any other building within one mile of said premises for such purposes, the defendant should forfeit the real estate.    The question of the validity of the contract was not raised, but it was held there had been no breach of the condition.    In *C. V. R. R. Co. v. Babb*, 9 Watts, 458, it was held simply that "an agreement to pay an incorporated railway company a certain sum to induce the location of their route at a particular place, is valid and binding and may be enforced by action."    *Jewett v. The L. & U. M. R. R. Co.*, 10 Ind., 539, is simply the case of a subscription to a railroad company in land upon condition of a location of the road within twenty rods of St. Omar.    The defendant built its road more than a mile from St. Omar, and it was held that the value of the land subscribed could be recovered.    It is evident that these cases fall very far short of sustaining the validity of the contract in question.    The other cases cited by appellees are not more directly in point.

That no relief will be granted on a contract which is illegal or against public policy, to a party who is in *pari delicto*, is abundantly and uniformly sustained by authority.    In *Bestoe v. Wallins*, 60 Ill., 138, it is said: "The defendants, in the court below filed a cross-bill, asking the court to cancel this contract as a cloud upon their title, and this was done.    In the view we have taken of the case the contract should be regarded as so far against public policy that neither party is entitled to the aid of the court.    The defendants have entered into a contract, the effect, or at least the tendency, of which was to induce the complainants to commit a breach of duty. The refusal to enforce the contract practically puts an end to

it; yet the court should not have granted affirmative relief on the cross-bill. To this extent the decree is modified. Both bills are dismissed, and the costs of this court equally divided."

In *Tyler v. Smith,* 18 B. Monroe, 793, the Court of Appeals held that if an individual pay money under an illegal contract, or a contract against public policy, he will not be aided by law to recover it; that the maxim *pari delicto patior est conditio defendentis* applies, and that the law in such cases leaves the parties as it finds them, and extends no help to either. In *Spalding v. Bank,* 12 Ohio, 544, which was an action to recover money paid to the bank under an illegal contract the court say: "It is an act *malum prohibitum,* and if the bank was seeking to recover it, it would not receive the aid of this court. It is, however, a part of the agreed statement that the money being in the hands of the bank, the plaintiff, when from time to time he presented his checks, consented to this reduction of five per cent. This being so, and the consideration being illegal, the plaintiff appears to us to be *particeps criminis.* He is in *pari delicto* with the bank, and while the law will not enforce an executory contract, but leave the parties as it finds them in such case, so neither will it aid the party who has performed such contract by enabling him to recover back the amount he has paid, but the maxim, *volenti non fit injuria,* applies in all its force. There is, perhaps, no principle on which there is less conflict of authority from the earliest to the most modern reports. *Roll v. Raguet,* 4 Ohio Rep., 418; *Raguet v. Roll,* 7 Ohio Rep., Part 1, 78; Chit. Con., 219; *Stone v. Hooker,* 9 Cow., 154; *Moon v. Adams* and *Newkirk, Sec.,* O. Rep., 372."

In *Perkins v. Savage,* 13 Wendell, 412, it is said: "It is supposed, however, by the counsel for the plaintiff, that if the contract is conceded to be illegal as against the policy of the act of incorporation, still the only consequence is to avoid it, and that the money placed in the hands of the defendant in pursuance thereof may be recovered back. He has referred to a number of cases for the purpose of supporting this propo-

sition * * * * . This proposition is laid down by Mr. Selwyn, Vol. 1, 74, and is fully supported by authority, viz: "When money is paid by one of two parties to an illegal contract to the other, in a case when both parties may be considered as *particeps criminis,* an action cannot be maintained after the contract is executed to recover the money back again, for *in pari delicto patior est conditio defendentis,* 8 T. Rep., 777; Doug., 467, 697; Cowp., 792. The same general proposition may be found in 2 Comyn on Contracts, 108; and, also, in Saunders on Pleading and Evidence, 677. This author says: 'If the illegal contract be executed, and both parties are in *pari delicto,* no action lies to recover money paid under it.' The same principle has been recognized and applied in the recent cases in the English courts, as it, also, has been by the Chief Justice in this court. 8 Taunt., 492; 1 Maule & Selw., 500, 751; 6 Cowen, 432." See, also, *Spence v. Harvey,* 22 Cal., 337; *Halladay v. Patterson,* 5 Oregon, 177; *Bolt v. Rogers,* 3 Paige, 154.

II. It is claimed, however, by appellees that if it should be conceded that the contract in question is against public policy, still the plaintiffs have a right to recover exactly what they were allowed in this case. It is claimed that the defendants procured the contract by fraud, and that, therefore, the plaintiffs may recover. The fraud upon the part of the defendant it is alleged consists in the defendant's promising to erect its only passenger depot in East Des Moines, intending at the time to violate this promise, and to erect a depot in West Des Moines. We are unable to see how this fact, if it exist, can render the contract legal upon the part of the plaintiffs. The plaintiffs, upon their own showing, entered into a contract which, if it had been adhered to, would have deprived a considerable portion of the citizens of Des Moines, and many of the general public, of the advantages to which they were entitled under the law, from the construction of the railroad in question. It cannot purge this contract of its illegality as to the plaintiffs, that they were induced to believe by the false

and fraudulent representations of the defendant that in con-
tracting for this injury and disadvantage to their neighbors
they would secure great advantages to themselves. This prop-
osition seems to us too clear to warrant further discussion.

III. It seems, also, to be the position of appellees that
this contract remains executory, and that the action is not
brought upon the contract, but in disaffirmance of it. The
authority mainly relied upon by appellees upon this branch
of the case is *White v. The Franklin Bank*, 22 Pick., 181.
In that case the plaintiff deposited with the bank $2,000,
upon the agreement that it should remain there six months,
which was in violation of the statute. The plaintiff brought
an action for the recovery of the money before six months
expired. It was held he might recover. The syllabus of the
case is as follows: "Where, upon the deposit of money in a
bank, the depositor received a book containing the cashier's
certificate thereof, in which it was stated that the money was
to remain in deposit for a certain time, it was held that such
agreement was illegal, and void under revised statutes, Code,
36, section 57, as being a contract by the bank for the pay-
ment of money at a future day certain, and that no action
could be maintained by the depositor against the bank upon
such express contract, but that he might recover the money
in an action commenced before the expiration of the time for
which it was to remain on deposit, the parties not being *in
pari delicto*, and the action being in disaffirmance of the
illegal contract; and that such action might be maintained
without a previous demand." The opinion fully supports
this syllabus.

It is evident that in that case the contract remained execu-
tory, for the money had not remained in the hands of the
defendant the full time stipulated in the agreement when the
action was brought. The action was not brought upon the
contract, for it was commenced before the plaintiff was enti-
tled to the money under the contract. The theory of the
claim in that case was that the contract was illegal, and hence

that the plaintiff was not under obligation to perform by leaving the money with the bank for the time stipulated. Suppose, however, that the plaintiff had permitted the money to remain in the bank for the time prescribed in the contract, and had sought to avail himself of the benefits of the contract, and after the lapse of six months, had sued, alleging the contract and the breach of it, and had sought to recover damages, what then would have been his situation? It was expressly ruled in this case that no action could be maintained on the contract. In Story's Equity Jurisprudence, section 296a, the following language is employed: "When a party to an illegal or immoral contract comes, himself, to be relieved from that contract or its obligations, he must distinctly and exclusively state such grounds of relief as the court can legally attend to, and he must not accompany his claim to relief which may be legitimate, with other claims and complaints which are contaminated with the original immoral purpose; for, if he sets up, as a ground of relief, the non-fulfilment of the illegal contract on the other side, and thereby that he is released from his obligation to perform it, that shows that he still relies upon the immoral contract and its terms for relief, and therefore the court will refuse it."

In this case the plaintiffs have fully performed the contract on their part. On their side the contract has been executed. The action is not brought in disaffirmance of their contract. Upon the contrary, they allege a full performance of the contract upon their part, and a breach of the contract upon the part of the defendant. It is upon this breach that they predicate their right to recover. Their action is upon the contract. This is apparent from the allegations and the prayer of the petition, as well as from the evidence submitted to suppport it. If the contract had been in all respects legal, and an action had been brought to recover damages for a breach of it, it would have been brought in exactly the form that this action is instituted. In *St. Joseph & Denver City R. R. Co. v. Ryan,* 11 Kansas, 602, the action was

brought in exactly the same form as this. We feel fully satisfied that for a breach of the contract, as alleged and proven, no damages are recoverable.

IV. The appellant assigns as error the refusal of the court to give the following instructions: "If you believe, from the evidence, that plaintiffs entered into a contract with defendant by which they agreed to procure to be deeded to defendant the lots described, in consideration of defendant's building and maintaining thereon its permanent and only depots in the city of Des Moines, and that such agreement on the part of the defendant was the consideration upon which plaintiffs, and those whom they claim to represent, advanced their money, if they did advance any, then you are instructed that such contract was against public policy, and illegal, and plaintiffs cannot recover thereon, or for a breach thereof."

It follows, from what has been already said, that this instruction should have been given. It follows, for the same reason, that the court erred in sustaining the demurrer to the fifth count of the defendant's answer.

V. It is urged by appellees that the defendant has not saved any such exceptions to the refusal of the court to give instructions asked as to warrant a consideration of the errors assigned thereon. The defendant asked the court to give eighteen instructions. Following these instructions, the abstract states: "which said instructions, and each of them, the court refused, to which said refusal, as to each of said instructions separately, the defendant at that time excepted, for the reason, as to each of said instructions separately, that the same correctly states the law applicable to said cause, and that the refusal of each of them is, and was, prejudicial error."

As the exception was taken at the time the instructions were refused, it was not necessary to state any reason for the exception. Code § 2787; *Van Pelt v. City of Davenport,* 42 Iowa, 308 (314). A general exception to the refusal to give instructions asked is sufficient. *Davenport Gas Light and*

*Coke Company* v. *The City of Davenport*, 13 Iowa, 229. The exceptions to the refusal to give the instructions asked would have been sufficient if they had been much less explicit.

VI.   The counsel for the respective parties have discussed very elaborately, and with much ability, the questions of the statute of limitations, and of the right of the parties plaintiffs to maintain this action jointly, and on behalf of themselves and other parties interested, not made parties to the record by name.

Regarding the foregoing discussion as decisive of the merits of the controversy, we deem it unnecessary to consider the other questions pressed upon our attention.   The judgment is

REVERSED.