FARRINGTON v. STUCKY et al.

(Circuit Court of Appeals, Eighth Circuit. November 18, 1908.)

No. 2,749.

1. CONTRACTS (§ 123*)—LEGALITY OF OBJECT—LOCATION OF RAILROAD.

A voluntary contract by individuals for the payment to a railroad company of a bonus to secure the construction of its line on a particular route is not illegal or against public policy, even though the line is thereby deflected from its most natural and cheapest route.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 570-575; Dec. Dig. § 123.*]

2. TRUSTS (§ 25*) — INSTRUMENTS CREATING TRUSTS — FORM — USE OF WORD "TRUSTEE."

When dealing with equitable considerations, the affixing of the term "trustee" to the name of the assignee of securities is to be given effect, and imports that he does not hold in his own personal right, but for the benefit of another.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 34; Dec. Dig. § 25.*

For other definitions, see Words and Phrases, vol. 8, pp. 7128-7133, 7822.]

3. EVIDENCE (§ 437*) — PAROL EVIDENCE AFFECTING WRITING — INVALIDATING WRITTEN INSTRUMENT.

The rule which forbids the introduction of parol evidence to contradict, vary, or add to a written contract does not extend to evidence to show that the contract was made in furtherance of objects contrary to law or public policy.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2027; Dec. Dig. § 437.*]

4. CONTRACTS (§ 123*)—LEGALITY OF OBJECT—LOCATION OF RAILROAD STATIONS.

An agreement by a railroad company not to establish or maintain a station between two given points is void as against public policy, and where it constitutes, in whole or in part, the consideration for contracts to pay a bonus to the company, such contracts are also void.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 570-575; Dec. Dig. § 123.*

Location and establishment of stations, see note to Willson v. Winchester & P. R. Co., 41 C. C. A. 219.]

5. CANCELLATION OF INSTRUMENTS (§ 28*) — RIGHT TO CANCELLATION—ILLEGAL CONTRACTS.

The rule that, where parties to an illegal contract or transaction are not equally guilty, the law will grant relief to the less culpable, does not authorize a court of equity to set aside a contract by a complainant to pay a bonus to a railroad company in consideration of its building its line on a certain route and its agreement not to maintain a station between two given points, which agreement has been executed by the company; but in such case the parties are equally culpable, and the complainant cannot plead his own wrongdoing as a ground for affirmative relief.

[Ed. Note.—For other cases, see Cancellation of Instruments, Cent. Dig. § 43; Dec. Dig. § 28.*]

Appeal from the United States Court of Appeals in the Indian Territory.

A bill in equity was filed in this cause by Alonzo J. Farrington, the appellant, against the defendants, W. L. Stucky, trustee, William Kenefick, trustee, and William Kenefick Company, asking a preliminary injunction to restrain the foreclosure of a trust deed under power of sale therein contained,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and as final relief asking that the trust deed and the notes secured thereby be declared illegal and void, and canceled. The facts out of which the controversy arose are substantially as follows:

The William Kenefick Company was, in the month of November, 1904, engaged in locating and constructing the Missouri, Oklahoma & Gulf Railroad, from Muskogee, Ind. T., southwesterly to a point of connection with the Ft. Smith & Western Railroad, within six miles of the station of Dustin. The defendant William Kenefick was at the time a stockholder, director, and president of both the construction company and the railroad company. He visited the town of Henryetta, in Indian Territory, and informed the complainant and other citizens that, unless a right of way and station grounds and a bonus of $20,000 were furnished by the citizens of Henryetta, the railroad would be constructed along the line of a preliminary survey about four miles east of that town. In response to that solicitation a written agreement was entered into securing the right of way and station grounds, and checks or notes secured by mortgage, amounting in the aggregate to $20,000, were placed in the hands of W. B. Hudson, John W. Sullins, and Anthony Crofton as a committee to represent the contributors to the bonus. At the same time this committee, as trustees for the contributors, entered into a written contract with the William Kenefick Company, providing on their part for the assignment of the $20,000 of securities to William Kenefick, as trustee, and on the part of the construction company binding it to have trains running on a regular schedule into the town of Henryetta on or before January 1, 1906, and to complete the road to its connection with the Ft. Smith & Western Railroad on or before September 1, 1906, and stipulating that, in case these provisions were not complied with, the notes and other securities should be absolutely void, and the trust deeds discharged of record. The complainant, as his contribution to the bonus, executed two promissory notes, for $250 each, payable to the committee above mentioned January 1, 1905, "or 30 days after trains are running on regular schedule into the town of Henryetta," and the other payable September 1, 1905, "or 30 days after connection is made with some railroad south of Henryetta, by the extension of said road through Henryetta to some point of connection." These notes were secured by a trust deed upon real property, which contained a power of sale to be exercised in case of default in paying the notes. It is further averred in the bill that at the time of the execution of the several instruments above mentioned it was orally agreed that no depot or townsite should ever be constructed or laid out between Henryetta and Dustin, and no stops or stations recognized by the railroad company, and that a written agreement to that effect should be executed and forwarded to the committee representing the contributors to the bonus, on the day following the execution of the other instruments, but that such supplementary agreement had never been given.

It is further averred that on the same day on which these papers were prepared and signed, viz., November 21, 1904, the said committee, to whom the securities were made payable, indorsed and assigned them to William Kenefick. The averments of the bill are, however, contradictory as to whether the assignments were made to William Kenefick personally, or to William Kenefick as trustee. In some parts of the bill the transaction is stated in one form, and in others in the other form. The written contract itself provided, as above stated, that the securities should be assigned to William Kenefick, trustee, and the notice of foreclosure, which is attached as an exhibit to the bill, also states that they were assigned to him as trustee; and the record at other places indicates that the assignment was made in that form. These securities were afterwards assigned by William Kenefick, as trustee, to W. L. Stucky, trustee.

The railroad was constructed in accordance with the agreement between the parties, and, default having been made in the payment of the notes, W. L. Stucky, as trustee, began the publication of a notice for the foreclosure of the trust deed under the power of sale therein contained. Thereupon the present bill was filed, and a preliminary injunction restraining the foreclosure granted. A general demurrer was afterwards interposed to the bill, which was sustained, and a decree entered dissolving the injunction and dismissing the bill upon the merits. An appeal was taken from this decree to the Court of

Appeals of Indian Territory, where the decree was affirmed, and the present appeal is brought to review the action of that court.

W. M. Matthews, for appellant.

Preston C. West, William M. Mellette, and Edward R. Jones, for appellees.

Before SANBORN and HOOK, Circuit Judges, and AMIDON, District Judge.

AMIDON, District Judge (after stating the facts as above). It is contended by the appellants that the notes and trust deed are void because the consideration therefor was against public policy and illegal. It is now too late to hold that an agreement for the payment of a bonus to a railroad company to secure the construction of its line along a given route is void as against public policy. That has been one of the conspicuous features of American railroad building. The Legislatures in nearly every state in the Union have authorized counties, cities, and other municipal bodies to issue bonds in aid of such enterprises. The conflict and strife of different communities to gain the location of the road in their midst has been a large factor in the building of every important railway line. After Legislatures have authorized the issuing of municipal bonds, and the exercise of the power of taxation, so as to compel every property owner in the community to contribute to these bounties, it would be wholly unwarrantable for the courts to declare that voluntary contributions made by citizens are void as against public policy. The courts as a rule are to get their notions of public policy from the legislative department; and when that department, by a long course of legislation, has indicated its views of what constitutes sound public policy on any subject, the courts cannot set up another standard. We are clearly, therefore, of the opinion that the mere giving of a bounty by the citizens of Henryetta for the purpose of securing the construction of the railroad through that city cannot be held to be illegal or against public policy. Neither can we say that the deflection of the road from the line of its preliminary survey to Henryetta prejudiced either the welfare of the railroad company or the public welfare. The bill contains no such charge, nor any statement of facts from which such an inference could be drawn. Its only averment on the subject is:

"That in causing said road to be built by way of Henryetta it was necessary to deflect the same from its most natural and cheapest route a great number of miles, namely, four miles, at a great additional cost to the Missouri, Oklahoma & Gulf Railroad Company, namely, about fifty thousand dollars."

We cannot hold as a matter of law that, because the route was not the cheapest and most natural, it was therefore not the best route, both for the public and the railroad company. In the early days of railroading, cheapness and shortness were regarded as controlling considerations; but at the present time the avoidance of short curves and high grades is deemed of greater importance. Within the last 12 years the Pennsylvania Railroad Company has expended more than $50,000,-000 in reconstructing its line between Pittsburgh and New York, and now, after the improvement is completed, it is found that the line is

several miles longer than it was originally. The expense, however, is amply justified, because short curves and steep grades have been eliminated. There is no averment in the bill impugning the route selected, except that it was not the cheapest and most natural; but any practical railroad man might still say that the route was best for all interests concerned, because it avoided curves and grades, and reached the traffic and served the convenience of the town of Henryetta.

The complainant, however, bases his charge of illegality mainly upon the contention that the bonus was solicited and received, not for the railroad company, but for the construction company, or for Mr. Kenefick personally. The bill leaves us in doubt on this subject. The written contract was made on the one part by the committee representing the contributors to the bonus, and on the other part by the William Kenefick Company. But we think a fair consideration of the entire record indicates that the securities were immediately assigned to William Kenefick as trustee, and by him assigned to the present holder as trustee. The bill in no way indicates the nature of the trust. It is urged by counsel representing the complainant, that the word "trustee" should be regarded as merely descriptio personæ; but the doctrine which he invokes is confined to negotiable instruments or contracts executed by an agent in his own name. When dealing with equitable considerations, such as are presented by this record, the affixing of the term "trustee" to the name of the holder of securities is to be given effect, and clearly imports that he does not hold in his own personal right, but for the benefit of another. Geyser-Marion Gold Mining Co. v. Stark, 106 Fed. 561, 45 C. C. A. 467, 53 L. R. A. 684. The bill is also obscure as to the relationship between the construction company and the railroad company. The only averment on that subject is that the former was "engaged in locating and constructing" a railroad for the latter. Whether the construction company was an independent contractor, or a mere agent or employé of the railroad company in building the road, is not disclosed. Nor is it stated whether the compensation for the work was fixed at a price per mile, or on the basis of the actual expense of the enterprise. If the construction company was a mere agency devised and employed by the railroad company for the construction of its line, and in soliciting and receiving the bonus the former was acting on behalf of the latter, we are clearly of the opinion that the transaction is valid. On the other hand, if William Kenefick was to receive the bonus, either directly himself or indirectly through the construction company, we are equally clear that the transaction would be void as against public policy. An officer of a corporation, while acting on its behalf, will not be permitted to use his powers for his own personal enrichment. Neither will courts consider whether or not the corporation is in fact prejudiced by the transaction from which the officer gains a personal profit. It will not permit an agent to place himself in a position in which he is tempted to betray his trust for private gain. It is the tendency of such conduct, and not the actual injury of the corporation, which the law condemns. The rule on the subject has been clearly declared by the Supreme Court in the case of Woodstock Iron Company v. Extension Company, 129

U. S. 643, 9 Sup. Ct. 402, 32 L. Ed. 819. The only question is wheth-
er the present bill states a case within the rule there enforced. The
basis of that decision is stated by Mr. Justice Field, as follows:

"In determining this question it must be borne in mind that the contract of
the Extension Company with the Georgia Pacific Railway Company was to lo-
cate and construct the road 'by the nearest, cheapest, and most suitable route
from Atlanta, Ga., through Alabama, to Columbus, in Mississippi,' for the
consideration of $20,000 a mile, and that it is averred in the pleadings, and
admitted by the demurrer, that in causing the road to be located by way of
Anniston it was necessary to deflect the same from the nearest and cheapest
and most natural route between the designated termini a distance of five
miles, at an additional cost of $100,000."

From this it will be observed that there was a written contract be-
tween the construction company and the railroad company, binding
the former to locate and construct the road "by the nearest, cheapest,
and most suitable route," and that the compensation was fixed at the
rate of $20,000 per mile. It was there alleged in the bill that in de-
flecting the road to Anniston the construction company violated the ex-
press provisions of this contract. It is also plain, from the terms of
the contract, that the construction company, in doing this, not only
wronged the railroad company, but enriched itself in the sum of $100,-
000, by adding to the length of the line. The record in that case
leaves no doubt upon the question that the bonus was solicited and
received by the construction company for its own use, for the suit
was brought by that company to collect an unpaid subscription. The
bill in the present case is obscure and indefinite as to each of these
matters. We cannot assign either to the construction company or to
Mr. Kenefick a corrupt and venal purpose, in the absence of an al-
legation in the bill to that effect, or the allegation of facts from which
such a purpose would be inferred as a reasonable conclusion. The
securities having been held both by Mr. Kenefick and by Mr. Stucky
as trustees, and there being no charge in the bill that this was a mere
cover to conceal Mr. Kenefick's private interest, or the interest of the
construction company, we cannot say that the railroad company has
not been at all times the beneficiary of the trust. Men are presumed
to act honestly. It was the duty of the complainant to state his case,
and all obscurities in the bill should be resolved against him, instead
of his adversary. If, therefore, we were compelled to decide whether
the case set up in the bill comes within the decision in Woodstock
Iron Company v. Extension Company, 129 U. S. 643, 9 Sup. Ct. 402,
32 L. Ed. 819, we should be obliged to hold against the complainant.

There are, however, other grounds upon which our decision can
be clearly placed. The agreement that no station or depot should
ever be established between Henryetta and Dustin is expressly set up
in the bill, and is admitted by the demurrer. It is charged that this
was the sole consideration for the bonus. That statement, however,
should probably be attributed in part to the zeal of the pleader. It was
competent for the complainant to prove this parol agreement for the
purpose of showing that the notes and trust deed were given in part
at least for an illegal consideration. If any part of its consideration
was illegal, the written agreement was void, and the writing cannot

be used for the purpose of foreclosing proof as to its own invalidity. "The rule which forbids the introduction of parol evidence to contradict, vary, or add to a written instrument does not extend to evidence to show that a contract was made in furtherance of objects forbidden by statute, by common law, or by the general policy of the law." Martin v. Clarke, 8 R. I. 389, 5 Am. Rep. 586; Friend v. Miller, 52 Kan. 139, 34 Pac. 397, 39 Am. St. Rep. 340; Gould v. Leavitt, 92 Me. 416, 43 Atl. 17; Sherman v. Wilder, 106 Mass. 537; Lewis v. Willoughby, 43 Minn. 307, 45 N. W. 439; Crawford v. Denyse, 18 N. J. Law, 325. The parol agreement would be void as against public policy. It would divest the railroad company of its power to perform its duties to the public. It comes clearly within numerous decisions in which contracts binding railroad corporations to locate a depot at a given point, and depriving them of the power to construct a depot at any other place, have been held illegal and void. Fuller v. Dame, 18 Pick. (Mass.) 472; Bestor v. Wathen, 60 Ill. 138; Louisville, etc., R. R. Co. v. Sumner, 106 Ind. 55, 5 N. E. 404, 55 Am. Rep. 719; Williamson v. Chicago, etc., R. R. Co., 53 Iowa, 126, 4 N. W. 870, 36 Am. Rep. 206; St. Joseph, etc., R. R. Co. v. Ryan, 11 Kan. 602, 15 Am. Rep. 357. The bill, therefore, states a case showing the invalidity of the notes and trust deed, and, if this were an action to enforce their payment, the oral agreement pleaded in the bill would be a complete defense.

This, however, is a suit in equity in which the complainant is seeking affirmative relief. He himself was a party to all the wrongdoing which he sets up in the bill. This is especially true as to the oral agreement. That shows upon its face that it was exacted by the complainant and his associates as one of the considerations moving to them for the giving of the bonus. All the facts which the complainant alleges for the purpose of showing that the notes and trust deed were void, as against public policy, show at the same time that he has no standing in a court of equity. The greater the illegality of their consideration, the greater becomes the illegality of his own conduct. This is conceded by counsel for complainant, and he invokes, for the purpose of rescuing his client from its fatal consequence, the rule that, when parties to an illegal transaction are not equally guilty, the law will grant relief to the less culpable. That rule, however, is confined to violations of statutes, or to offenses in which the law violated is intended for the coercion of one party and the protection of the other, or where there has been such fraud or coercion as to destroy the consent of the party seeking relief. Unless one or more of these features are present, the doctrine is never applied to a transaction which involves moral delinquency or is against sound public policy. This distinction was accurately stated early in this country by the Supreme Judicial Court of Massachusetts in the case of White v. Franklin Bank, 22 Pick. 181–186:

"This principle [of comparative guilt], however, is not by law allowed to operate in favor of either party where the illegality of the contract arises from any moral turpitude. In such cases the court will not undertake to ascertain the relative guilt of the parties or afford relief to either."

The doctrine was again asserted in the case of Lowell v. Boston & Lowell Railroad Co., 23 Pick. (Mass.) 24–32, 34 Am. Dec. 33, as follows:

"The rule is, 'In pari delicto potior est conditio defendentis.' If the parties are not equally criminal, the principal delinquent may be held responsible to his co-delinquent for damages incurred by their joint offense. In respect to offenses in which is involved any moral delinquency or turpitude, all parties are deemed equally guilty, and courts will not inquire into their relative guilt. But where the offense is merely malum prohibitum, and is in no respect immoral, it is not against the policy of the law to inquire into the relative delinquency of the parties, and to administer justice between them, although both parties are wrongdoers."

Referring to the same distinction, the Court of Appeals of New York, in the leading case of Tracy v. Talmage, 14 N. Y. 162–181, 67 Am. Dec. 132, says:

"The cases in which the courts will give relief to one of the parties on the ground that he is not in pari delicto form an independent class, entirely distinct from those cases which rest upon a disaffirmance of the contract before it is executed. It is essential to both classes that the contract be merely malum prohibitum. If malum in se, the court will in no case interfere to relieve either party from any of its consequences. But where the contract neither involves moral turpitude nor violates any general principle of public policy, and money or property has been advanced upon it, relief will be granted to the party making the advance."

The same doctrine has been asserted with equal force by the Supreme Court of the United States. The subject is fully discussed and the authorities reviewed in the case of St. Louis, Vandalia & Terre Haute Railroad Co. v. Terre Haute & Indianapolis Railroad Co., 145 U. S. 393, 407, 12 Sup. Ct. 953, 957, 36 L. Ed. 748. It is there said:

"The general rule. in equity as at law, is, 'In pari delicto potior est conditio defendentis;' and, therefore, neither party to an illegal contract will be aided by the court, whether to enforce it or to set it aside. If the contract is illegal, affirmative relief against it will not be granted at law or in equity unless the contract remains executory, or unless the parties are considered not in equal fault, as where the law violated is intended for the coercion of the one party and the protection of the other, or where there has been fraud or oppression on the part of the defendant. * * * When the parties are in pari delicto, and the contract has been fully executed on the part of the plaintiff by the conveyance of property, or by the payment of money, and has not been repudiated by the defendant, it is now equally well settled that neither a court of law nor a court of equity will assist the plaintiff to recover back the property conveyed or money paid under the contract."

See, also, Harriman v. Northern Securities Co., 197 U. S. 244, 25 Sup. Ct. 493, 49 L. Ed. 739; McMullen v. Hoffman, 174 U. S. 639, 19 Sup. Ct. 839, 43 L. Ed. 1117.

Where a transaction involves moral turpitude, if courts were to attempt to weigh the comparative wickedness of the parties, and afford relief upon an estimate of that kind, the administration of justice would be removed from the realm of jurisprudence into the realm of ethics. Each case would depend upon the varying notions of wickedness entertained by the tribunal trying it. The general language of Mr. Pomeroy, at section 942 of his work on Equity Jurisprudence, is altogether too vague to be of any service in the administration of law. If the authorities which he cites in support of the statements of

the text are examined, they will all be found to fall within well-recognized specific rules.

If we adopt complainant's theory, his conduct clearly involves moral turpitude. In the Woodstock Iron Co. Case a transaction identical with this, according to complainant's interpretation of his bill, was characterized, when the conduct of the acceptor of the bonus was under examination, as a bribe to induce an employé to be faithless to his employer, an officer of a corporation to betray his trust, and a railway company to be false to its duty to the public. But surely in a court of justice it is not more tolerable for a bribe giver than for a bribe taker, and the severe condemnation which was there denounced against the acceptor of such a bonus must here fall upon the complainant as its giver. The fact is that the complainant is in a strait between two matters. He must paint the transaction black enough to make the notes and trust deed void for illegality; otherwise, they stand as valid obligations, and his suit fails for that reason. But, on the other hand, if the transaction was corrupt, he was a prime actor in it, and is obliged to present himself to a court of equity with unclean hands. Whichever alternative he chooses is fatal to his cause. The contract has been fully executed. The complainant and his associates have received all the fruits of their unlawful bargain, and they now come into a court of equity and ask that the price which they paid be returned to them. There was no fraud or oppression which would entitle them to exception from the general rule that courts will not aid those engaged in willful wrongdoing. Courts will not grant relief to a party concerned in an illegal transaction on the ground of fraud, duress, or undue influence, unless the agreement, if lawful, would be set aside upon these grounds at the instance of the party wronged. Wald's Pollock on Contracts, 505. In the present case it would be idle to contend that either of these elements is present.

This case is not ruled by the decision in Stewart v. Wright, 147 Fed. 321, 77 C. C. A. 499. That case did not proceed upon a weighing of the comparative guilt of the plaintiff and defendant. It was governed by considerations of public policy. On the one hand was the public policy which denies to a party concerned in an illegal transaction any judicial relief as a powerful motive to deter people from engaging in such transactions. On the other hand stood the criminal organization known as the "Buckfoot Gang," which, like a lottery, was preying upon the credulity and cupidity of a large section of the country, and the many considerations of sound public policy which demanded that it be deprived of its spoils as the most efficient method of striking down the organization itself. The court, balancing these considerations of public policy the one against the other, sustained the right of the plaintiff to recover. This was done, not out of consideration for him, but as the surest method of protecting society against an institution whose vocation was swindling. The gist of that decision is found in the following paragraph:

"We are also of the opinion that, viewing the conduct of Wright in its most reprehensible light, nevertheless the interest and welfare of the public would be better subserved by causing the loss to fall upon those who aided and assisted in criminal practices followed as an occupation than by the punishment

of the individual victim. It would be doubtful wisdom to extend encouragement to organizations of confidence men who prey upon the public by allowing them the use of the rule 'In pari delicto' as a shield of defense, when a part of the scheme they employ is to place those they seek and then defraud in the position they rely on."

The same public policy, with many circumstances of aggravation, was present in this case which underlies the rule permitting a recovery of money lost in gambling or paid upon usurious contracts. The court, in granting relief to a plaintiff under such circumstances, is not moved by the fact that he is less guilty than the defendant, but by motives of public policy. It is not necessary to review the features of the present case to show that none of the considerations which controlled the court in Stewart v. Wright are here present.

It must be borne in mind that the plaintiff is here asking affirmative relief, and he pleads his own wrongdoing as the ground for invoking the aid of the court. That is a feature which distinguishes this case from most cases involving similar transactions. Generally such actions have been brought to collect the bonus, while here the giver of the bonus is seeking the aid of equity to get it back. If the situation of the parties were reversed, and the defendants were in court asking its aid for the enforcement of the notes and trust deed, the facts pleaded would be a complete defense. If the time should ever come when the defendants would require the aid of a court to realize the fruits of this transaction, and it were then shown to be of the character alleged in the bill, they would necessarily be denied any assistance.

The case of Basket v. Moss, 115 N. C. 448, 20 S. E. 733, 48 L. R. A. 842, 44 Am. St. Rep. 463, upon which the complainant relies, belongs to a limited class in which actions have been brought to recover back money paid for the purchase of a commission in the military or naval service or appointment to a public office. "Those cases," as the Supreme Court of the United States says (145 U. S. 406, 12 Sup. Ct. 957, 36 L. Ed. 748), "have sometimes been justified upon the ground that, the agreement being against the policy of the law, relief was given to the public through the party." The doctrine has been confined strictly to the class of cases in which it was first enunciated; and at the present time it would seem that the dissenting opinion in the case is based upon the sounder considerations of public policy.

The case must therefore be affirmed.