STEVENS, Respondent, *v.* WOODMEN OF THE WORLD, Appellant.

(No. 7,660.)

(Submitted March 26, 1937.   Decided May 18, 1937.)

[71 Pac. (2d) 898.]

*Messrs. John G.* and *William A. Brown,* for Appellant, submitted an original and a supplemental brief; *Mr. John G. Brown* argued the cause orally.

*Mr. Wellington D. Rankin* and *Mr. Arthur P. Acher,* for Respondent, submitted a brief; *Mr. Acher* argued the cause orally.

MR. JUSTICE ANDERSON delivered the opinion of the court.

Plaintiff brought this action to recover on a policy of life insurance issued by the defendant, a fraternal insurance corporation operating under the lodge system. The cause was tried before the court sitting without a jury, and resulted in a judg-

ment in favor of the plaintiff in accordance with the prayer of her complaint. The trial court found the issues generally in favor of the plaintiff. The appeal is from the judgment.

The defendant contends that the evidence was insufficient to support the judgment. A. W. Stevens, the insured, in the year 1922 secured a policy of insurance from the defendant. On November 1, 1928, a new policy was issued to Stevens in lieu of the former one under a different plan of insurance, but for a like amount; he died on December 16, 1932. In the application for the original policy, and also in his application for the conversion of it into the later policy, he designated Marie Cushing, the plaintiff, as beneficiary, stating in each instance that she was his cousin. She was not, at the time of making these applications and the issuance of policies, so related to the insured. She was designated as the beneficiary in the policies showing her relationship in each to be that of a cousin to the insured.

Plaintiff was married to Dr. Cordan, who died in Salt Lake City in 1901. She testified on the trial of this case that she was married to Albert J. Cushing in 1904. Later she and Cushing came to Helena, and she met the insured about 1917 or 1918. Thereafter she and these two men lived together until Cushing's death on October 31, 1931. Cushing had a policy of life insurance issued by the defendant in favor of the plaintiff as his wife, and this policy was paid to the plaintiff.

It was the theory of plaintiff's case that she and Stevens were husband and wife at the time of the latter's death as the result of a common-law marriage between them occurring at Salt Lake City some few days after Cushing's death and immediately following his burial there. The undisputed evidence is that following the return of plaintiff and the insured from Salt Lake in 1931, they lived together in Helena and Missoula as man and wife, held each other out as such, and were regarded as man and wife by their friends and acquaintances during this interval of time.

It appears from the record that the insured left a will in plaintiff's favor, and she testified in a proceeding to have the will admitted to probate. She was confronted with this tes-

timony on the trial of this case, which was contradictory of her testimony given in this case. She testified in the probate proceeding that she and Cushing were never married and that, after she met Stevens, she and Stevens lived together as man and wife, and Cushing became a boarder. Other contradictions appear between her testimony on these two different occasions as disclosed by the record before us, but these are sufficient to illustrate the point. Plaintiff's testimony on the former hearing was not substantive evidence concerning the subject-matter, and its presentation in the trial of this cause only raised a question of the credibility of the witness, which was for the trial court. In the case of *Wise* v. *Stagg*, 94 Mont. 321, 22 Pac. (2d) 308, we said: "After contradiction of a witness by showing his inconsistent statements at other times, not only is such contradictory evidence not substantive evidence concerning its subject-matter, but, as before, the credibility of the witness remains a question for the jury. (6 Jones' Commentaries on Evidence, 2d ed., 4769; *Thompson* v. *Los Angeles etc. R. Co.*, 165 Cal. 748, 134 Pac. 709; *Steele* v. *Kansas City So. R. Co.*, 302 Mo. 207, 257 S. W. 756." This statement was approved by this court in the case of *Osnes Live Stock Co.* v. *Warren*, 103 Mont. 284, 62 Pac. (2d) 206.

Under the constitution and by-laws of the defendant as well as section 6311 of our Codes (the Colorado statute is the same as ours), a first cousin could become the beneficiary of a fraternal life insurance policy. One who does not occupy some one of the degrees of relationship with the insured enumerated in section 6311, supra, may not be beneficiary of such a policy. (*Nitsche* v. *Security Benefit Assn.*, 78 Mont. 532, 255 Pac. 1052.) Clearly, the plaintiff was not at the time of the issuance of this policy a legal beneficiary. The defendant contends that because of this fact, the representations made in the application amounted to a fraud upon the defendant, and that therefore, under the terms of certain provisions of the constitution and by-laws, the policy was vitiated because of this fraud. The policy, however, contained the following provision: "This certificate shall be incontestable for any cause except non-pay-

ment of benefit payments and dues, when it has been maintained continuously in force for a period of one year during the lifetime of the member, provided that if the certificate has been reinstated at any time, then said period of one year shall run from the date of last reinstatement and subject to any statements made to secure such reinstatement.''

The effect of such incontestable clause in insured's policy is ▮▮▮ well stated by the Supreme Court of the United States in the opinion of the case of *Mutual Ins. Co.* v. *Hurni Co.*, 263 U. S. 167, 177, 44 Sup. Ct. 90, 68 L. Ed. 235, 31 A. L. R. 102, in the following language: ''It is true, as counsel for petitioner contends, that the contract is with the insured and not with the beneficiary, but, nevertheless, it is for the use of the beneficiary and there is no reason to say that the incontestability clause is not meant for his benefit as well as for the benefit of the insured. It is for the benefit of the insured during his lifetime and upon his death immediately inures to the benefit of the beneficiary. As said by the supreme court of Illinois in *Monahan* v. *Metropolitan Life Ins. Co.*, 283 Ill. 136, 141, 119 N. E. 68, L. R. A. 1918D, 1196: 'Some of the rights and obligations of the parties to a contract of insurance necessarily become fixed upon the death of the insured. The beneficiary has an interest in the contract, and as between the insurer and the beneficiary all the rights and obligations of the parties are not determined as of the date of the death of the insured. The incontestable clause in a policy of insurance inures to the benefit of the beneficiary after the death of the insured as much as it inures to the benefit of the insured himself during his lifetime.' ''

It is almost universally held that an incontestable clause allowing a reasonable time such as a year cuts off all defenses including fraud, except those specifically and expressly enumerated in the clause. The decided cases sustaining this view are numerous, and include cases where the insured has made false statements as to health, age, occupation, etc. The following texts and cases support the foreging statement: 8 Couch on Insurance, 6957, sec. 2155; notes, 6 A. L. R. 452; 35 A. L. R. 1492; *Apter* v. *Home Life Ins. Co.*, 266 N. Y. 333, 194 N. E. 846, 98

A. L. R. 1281; 2 Bacon on Benefit Societies & Life Insurance, 3d ed., 875; 37 C. J. 544; 5 Cooley's Briefs on Insurance, 4483; *Great Southern Life Ins. Co.* v. *Russ,* 14 Fed. (2d) 27; *Mutual Reserve Fund Life Ins. Assn.* v. *Austin,* 142 Fed. 398, 6 L. R. A. (n. s.) 1064; *Great Western Life Ins. Co.* v. *Snavely,* 206 Fed. 20, 40 L. R. A. (n. s.) 1056 [9th Circuit]; *Arnold* v. *Equitable Life Assur. Soc.,* 228 Fed. 157; *Russ* v. *Great Southern Life Ins. Co.,* 6 Fed. (2d) 940; *Pacific Mut. Life Ins. Co.* v. *Strange,* 223 Ala. 226, 135 So. 477; *Dibble* v. *Reliance Ins. Co.,* 170 Cal. 199, 149 Pac. 171, Ann. Cas. 1917E, 34; *Flanigan* v. *Federal Life Ins. Co.,* 231 Ill. 399, 83 N. E. 178; *Weil* v. *Federal Life Ins. Co.,* 264 Ill. 425, 106 N. E. 246, Ann. Cas. 1915D, 974; *Ramsey* v. *Old Colonial Life Ins. Co.,* 297 Ill. 592, 131 N. E. 108; *Kanter* v. *Continental Assur. Co.,* 251 Ill. App. 272; *Indiana Life Ins. Co.* v. *McGinnis,* 180 Ind. 9, 101 N. E. 289, 45 L. R. A. (n. s.) 192; *New York Life Ins. Co.* v. *Adams,* 202 Ind. 493, 176 N. E. 146; *Commercial Ins. Co.* v. *McGinnis,* 50 Ind. App. 630, 97 N. E. 1018; *Kansas Mut. Life Ins. Co.* v. *Whitehead,* 123 Ky. 21, 93 S. W. 609, 13 Ann. Cas. 301; *Mutual Life Ins. Co.* v. *New,* 125 La. 41, 51 So. 61, 126 Am. St. Rep. 326, 27 L. R. A. (n. s.) 431; *Becker* v. *Illinois Life Ins. Co.,* 227 Mich. 388, 198 N. W. 884; *Williams* v. *St. Louis Ins. Co.,* 189 Mo. 70, 87 S. W. 499; *Harris* v. *Security Life Ins. Co.,* 248 Mo. 304, 154 S. W. 68, Ann. Cas. 1914C, 648; *Drews* v. *Metropolitan Life Ins. Co.,* 79 N. J. L. 398, 75 Atl. 167; *Teeter* v. *United Life Ins. Assn.,* 159 N. Y. 411, 54 N. E. 72; *Wolpin* v. *Prudential Ins. Co.,* 223 App. Div. 339, 228 N. Y. Supp. 78; *Strzelicka* v. *Chicago Fraternal Life Ins. Assn.,* 140 Misc. 517, 250 N. Y. Supp. 601; *Chinery* v. *Metropolitan Life Ins. Co.,* 112 Misc. 107, 182 N. Y. Supp. 555, 556; *American Trust Co.* v. *Life Insurance Co. of Virginia,* 173 N. C. 558, 92 S. E. 706; *Hardy* v. *Phoenix Mutual Life Ins. Co.,* 180 N. C. 180, 104 S. E. 166; *Metropolitan Life Ins. Co.* v. *Peeler,* 122 Okl. 135, 176 Pac. 939, 6 A. L. R. 441; *Murray* v. *State Mutual Life,* 22 R. I. 524, 48 Atl. 600, 53 L. R. A. 742; *Philadelphia Life Ins. Co.* v. *Arnold,* 97 S. C. 418, 81 S. E. 964, Ann. Cas. 1916C, 706; *Union Cent. Insurance Co.* v. *Fox,* 106 Tenn. 347, 61 S. W. 62, 82 Am. St. Rep. 885; *Harrison* v. *Provi-*

*dent Relief Assn.,* 141 Va. 659, 126 S. E. 696, 40 A. L. R. 616; *Patterson* v. *Natural Premium Mut. Life Ins. Co.,* 100 Wis. 118, 75 N. W. 980, 69 Am. St. Rep. 899, 42 L. R. A. 253.

The reasons for the insertion of an incontestable provision in a policy of life insurance are set forth in *Massachusetts Life Assn.* v. *Robinson,* 104 Ga. 256, 30 S. E. 918, 42 L. R. A. 261, as follows: ''In many cases, no doubt, the misrepresentation would be innocent, with no intention to defraud the insurer; while in others possibly a deliberate intention to defraud might be developed. In all cases, however, the question as to whether there had been any intention on the part of the insured to perpetrate a fraud upon the insurer, and whether such scheme should be successful, was to be determined after the death of insured, when he could no longer be heard on the questions involving not only the validity of the contract, but sometimes his character as well. The insurer, having in his hands the premiums paid by the insured during his lifetime, as well as the accumulations which had been made thereon, was permitted to raise questions of this nature in a controversy between himself and the beneficiary of the policy, and was, as has been said, in many cases allowed to defeat entirely the contract entered into with the insured, when he could no longer be heard in explanation of his conduct or vindication of his character.''

An excellent statement of the effect of such provisions is found in the same opinion, wherein it was said: ''Where parties enter into a contract which from its nature affords an opportunity of one party to perpetrate a fraud upon another, and it is stipulated therein that the party who is liable to be defrauded shall have a specified time in which to make inquiry as to the acts and conduct of the other party, he is on notice by the very terms of the contract itself that fraud may be involved in it, and the duty is upon him to commence at once an investigation into the acts, conduct and representations of the other party; and if the time fixed is such that the information which would show that the fraud had been perpetrated could have been, by the exercise of ordinary diligence, obtained, then the parties are bound by their contract as to time, and after the lapse of that

time, fraud is no longer a defense. This does not violate in any way the well-settled principle that fraud is to be abhorred, vitiates everything it touches, and the person guilty of it is not to be countenanced in any way by the courts. While all this is true, it is equally well settled that a contract which has for its foundation a wilful fraud may become vitalized and enforceable by the negligence of the party who was the victim of the fraud.''

In *Wright* v. *Mutual Ben. Life Assn.,* 119 N. Y. 237, 23 N. E. 186, 16 Am. St. Rep. 746, 6 L. R. A. 731, referring to an incontestable provision, it was said: ''It recognizes fraud and all other defenses but it provides ample time and opportunity within which they may be, but beyond which they may not be, established. It is in the nature of and serves a similar purpose as statutes of limitations and repose, the wisdom of which is apparent to all reasonable minds. It is exemplified in the statute giving a certain period after the discovery of a fraud in which to apply for redress on account of it and in the law requiring prompt application after its discovery, if one would be relieved from a contract infected with fraud. * * * No doubt the defendant held it out as an inducement by removing the hesitation in the minds of many prudent men against paying ill-afforded premiums for a series of years when in· the end and after the payment of premiums, the death of the insured and the loss of his and the testimony of others, the claimant instead of receiving the promised insurance may be met by an expensive lawsuit to determine that the insurance which the deceased has been paying for through many years, has not and never had an existence except in name. While fraud is obnoxious and should justly vitiate all contracts, the courts should exercise care that fraud and imposition should not be successful in annulling an agreement, to the effect that if cause be not found and charged within a reasonable and specific time, establishing the invalidity of the contract of insurance, it should thereafter be treated as *valid.*''

Answering the contention that fraud vitiates everything and that, therefore, an incontestable clause does not cut off the de-

fense of fraud, the supreme court of Kentucky, in the case of *Kansas Mutual Life Ins. Co.* v. *Whitehead*, 123 Ky. 21, 93 S. W. *609*, 13 Ann. Cas. 301, said: "It is said that, as a rule, fraud vitiates every contract, and that a sound morality requires that the courts should forbid one's contracting for immunity from the consequences of his own fraud. All this may be admitted to be sound as an abstract proposition; but it does not hold good in the actual affairs of life, when rules must be adjusted to meet conditions, rather than theories. In the case at bar, full force and effect is given to the theory for a specified time—two years—and after that another public policy comes into play, which recognizes the right of the insured, under certain circumstances, to contract for peace, and for a knowledge that after the stipulated time has expired, neither he, nor, if he be dead, those for whom he has undertaken to provide, shall be put to the expense and trouble of a trial of the question as to whether or not fraud was perpetrated in the procurement of the policy. This view does not exclude the consideration of fraud, but allows the parties to fix by stipulation the length of time which the fraud of the insured can operate to deceive the insurer. It recognizes the right of the insurer, predicated upon a vast experience and profound knowledge in such matters, to agree that in a stipulated time, fixed by himself, he can unearth and drag to light any fraud committed by the insured, and protect himself from the consequences. This clause is of vast importance and benefit, both to the insured and to the insurer. It enables the latter to increase his business by giving an assurance to persons doubtful of the utility of insurance, that neither they nor their families, after the lapse of a given time, shall be harassed with lawsuits when the evidence of the original transaction shall have become dim, or difficult of obtention, or when, perhaps, the lips of him who best knew the facts are sealed by death. That this consideration is a powerful inducement, especially to the poor and obscure, to take out insurance, cannot be doubted; and after the lapse of this reasonable time, it must, of necessity, be of great consolation to the insured to feel that the insurance money, to secure which he has, perhaps,

so often endured privation, will be paid over to his family undiminished by court costs or lawyers' fees. To permit an insurance company to induce persons to insure their lives under the pleasing expectation of an incontestable clause, and then, when the insured is dead, to undertake, as against his family, to contest the policy on the ground of fraud, would be to permit the perpetration of as great fraud as the insured could possibly have committed in the obtention of the policy. There is no more public policy against the fraud of the insured than against the fraud of the insurer. The incontestable clause is upheld in law, not for the purpose of upholding fraud, but for the purpose of shutting off harassing defenses based upon alleged fraud; and, in so doing, the law merely adopts the certificate of the insurer that within a given time he can expose and render innocuous any fraud in the preliminary statement of the insured.''

Again, it is said that it is against good morals to permit plaintiff to recover on a contract which was the child of fraud. The supreme court of Missouri, in the case of *Harris* v. *Security Life Insurance Co.*, supra, stated a similar contention, and answered it as follows: ''But we gather from their brief that they are content to assail the proposition by characterizing the reasoning of the courts as being 'more specious than sound,' 'at variance with good morals,' 'sophistry,' and inconsistent with the 'Decalogue.' This method of assailing the logic of the decisions of the courts, if it be lacking in demonstrative force or constructive reasoning, may have the merit, at least, of reflecting the temper and taste of the writers. Possibly the great judgments of the great judges cited above will not be wholly dissolved by an irruption so slight and so entirely free from every element of dialectical reasoning or any form of logical disproof. We are inclined to indulge this hope when we bear in mind that the demolition of this great consensus of judicial conclusion is attempted, only, by the use of the particular aerial force which is said to have overthrown the walls of Jericho.''

Other courts have met the contention that a policy of insurance obtained through fraud is void *ab initio* and will not

therefore permit recovery even in the face of an incontestable clause, such as here, and have declined to accede to the force of such a contention. (*Stiegler* v. *Eureka Life Ins. Co.*, 146 Md. 629, 127 Atl. 397; *Drews* v. *Metropolitan Life Ins. Co.*, supra.)

When we say that a contract is void as a result of fraud—and many such expressions appear in the books—all that is meant by such term, according to any legal usage, is that a court of law will not lend its aid to enforce the performance of a contract. In the case of *Ewell* v. *Daggs*, 108 U. S. 143, 2 Sup. Ct. 408, 27 L. Ed. 682, it was said: "It is quite true that the usury statute referred to declares the contract of loan, so far as the whole interest is concerned, to be 'void and of no effect.' But these words are often used in statutes and legal documents, such as deeds, leases, bonds, mortgages, and others, in the sense of voidable merely, that is, capable of being avoided, and not as meaning that the act or transaction is absolutely a nullity, as if it had never existed, incapable of giving rise to any rights or obligations under any circumstances. Thus we speak of conveyances void as to creditors, meaning that creditors may avoid them, but not others. Leases which contain a forfeiture of lessee's estate for nonpayment of rent, or breach of other condition, declare that on the happening of the contingency the demise shall thereupon become null and void, meaning that the forfeiture may be enforced by re-entry, at the option of the lessor. It is sometimes said that a deed obtained by fraud is void, meaning that the party defrauded may, at his election, treat it as void. All that can be meant by the term, according to any legal usage, is that a court of law will not lend its aid to enforce the performance of a contract which appears to have been entered into by both the contracting parties for the express purpose of carrying into effect that which is prohibited by the law of the land."

Our own court, in the case of *Mutual Benefit Ins. Co.* v. *Winne*, 20 Mont. 20, 49 Pac. 446, in considering a statute which provided that the failure of a foreign corporation to file a certain statement should, by way of punishment, render all of its acts and contracts while in default, void and invalid, said: "We must not be misled into giving to the words 'void' and 'invalid'

too broad a meaning, for, as has been well observed by a learned court, deductions founded on the broadest meaning of the word 'void' would lead to greater errors than are found in the most erroneous cases, while those founded on its narrower and more usual meaning seldom err. (*Pearsoll* v. *Chapin*, 44 Pa. St. 9.) Therefore, before the court can say that a mortgage made by a citizen of this state to a foreign corporation which has failed to file its certificate and statements required to be filed before it can undertake to do any business within the state is void in the sense that it is an absolute nullity, it should be assured of the correct meaning of the word; it should observe the use of the word in the context of the statute. A void contract is the same as none, although a voidable one may be so treated. (*Gist* v. *Smith*, 78 Ky. 367.) The two words 'void' and 'voidable,' as often used in the statutes, have been pronounced by Bishop (sec. 610 of his work on Contracts) to be variable, and most inexact. But a correct discrimination will lead us to a right conclusion. It cannot be held that the contract of Winne with the plaintiff corporation is without any legal effect, for it has some effect, but it is liable to be made void by him or a third person.''

We are mindful that some courts hold that an incontestable clause which becomes operative upon the issuance of the policy is invalid, as is illustrated by the decision in *Reagan* v. *Union Mut. Life Ins. Co.*, 189 Mass. 555, 76 N. E. 217, 109 Am. St. Rep. 659, 4 Ann. Cas. 362, 2 L. R. A. (n. s.) 821. That decision, however, recognizes the rule which we have stated supra as sound.

It is contended that plaintiff may not rely upon the incontestable clause for the reason that it was not pleaded. No pleadings on behalf of the plaintiff mentioned the clause and the policy of insurance was not attached to the complaint as an exhibit. The defendant, however, without objection offered in evidence the policy containing the incontestable clause, and it was before the court. Under these circumstances, even though the allegations of plaintiff's pleadings may not have been broad enough to admit the proof, they will be deemed as amended at the trial in that respect if this be necessary to sustain the judg-

ment under the provisions of section 9191, Revised Codes. (*Baker* v. *Union Assur. Soc. of Londan, Ltd.*, 81 Mont. 281, 264 Pac. 132, and cases there cited.) The incontestable clause appearing in the policy in question bars the defense of fraud.

We have certified to us among the exhibits a printed volume of the constitution and by-laws of the defendant. Also we find this statement of counsel in the record: "I really believe we would save time by offering the three sets of the constitution and by-laws, and then they can go up as exhibits." To this statement the trial judge gave his consent. Section 104 of this document provides the manner of changing beneficiaries. After an examination of its contents it appears that the insured may change beneficiaries as often as desired, observing certain formalities, but nowhere is it indicated that the approval of the insurer is necessary to any proposed change.

It is generally held by the weight of authority, with reference to old line company policies, that a statement in an application for insurance as to the relationship of a proposed beneficiary, is to be regarded as intended merely for identification, as a mere description of the person. (*Metropolitan Life Ins. Co.* v. *Olsen*, 81 N. H. 143, 123 Atl. 576, 32 A. L. R. 1472; *Vivar* v. *Supreme Lodge K. of P.*, 52 N. J. L. 455, 20 Atl. 36; *Standard Life & Acc. Ins. Co.* v. *Martin*, 133 Ind. 376, 33 N. E. 105; *Lampkin* v. *Travelers Ins. Co.*, 11 Colo. App. 249, 52 Pac. 1040; *Equitable Life Assur. Soc.* v. *Paterson*, 41 Ga. 338, 5 Am. Rep. 535; *Slaughter* v. *Slaughter*, 186 Ala. 302, 65 So. 348; *Story* v. *Williamsburgh Masonic Mut. Benefit Assn.*, 95 N. Y. 474; *Baltimore Life Ins. Co.* v. *Floyd*, 5 Boyce (Del.), 431, 94 Atl. 515; *Brogi* v. *Brogi*, 211 Mass. 512, 98 N. E. 573.) It is also held with reference to fraternal insurance companies that a false statement as to the relationship of the beneficiary named is not a breach of a warranty, nor does it vitiate the policy on the ground of fraud. (*Britton* v. *Supreme Council of the Royal Arcanum*, 46 N. J. Eq. 102, 18 Atl. 675, 19 Am. St. Rep. 376; *Cunat* v. *Supreme Tribe of Ben Hur*, 249 Ill. 448, 94 N. E. 925, Ann. Cas. 1912A, 213, 34 L. R. A. (n. s.) 1192; *Supreme*

*Lodge, A. O. U. W.,* v. *Hutchinson,* 6 Ind. App. 399, 33 N. E. 816.)

In the case of *Cunat* v. *Supreme Tribe of Ben Hur,* supra, the court said: ''It is further contended that the insured warranted or falsely represented the statement 'bearing to me the relationship of cousins' to be true, and that unless the statement was literally true, the benefit certificate was void. The benefit certificate contained the usual covenants that the insured warranted the truth of her representations. The language above quoted amounted only to a direction by the insured to the association as to whom the insurance, upon her death, should be paid, and did not amount to a warranty or false representation and did not have the effect to avoid the benefit certificate.''

In the case of *Britton* v. *Supreme Council of the Royal Arcanum,* supra, the court said: ''Whether the person designated by a member on his admission as his beneficiary is qualified or not is a question which is wholly unimportant and immaterial to the defendant. The designation then made will only continue in force so long as the member chooses to let it stand. He has a right to change his beneficiary as often as his will changes. The only limit upon his power in that regard is that he cannot make a designation which will divert that part of the fund payable on his death from its appointed channel; and whether he designates a qualified or incompetent person can have no effect whatever in either increasing or diminishing the defendant's liability. The sum which it must pay on the death of a member is fixed by its contract, as well as the person or persons to whom it must be paid. * * * A falsehood or fraud that does not result in legal injury can neither be made the foundation of an action nor the ground of a defense.''

The foregoing authorities demonstrate that a lack of insurable interest at the time of the issuance of the policy does not render the policy void *ab initio.* To attempt to name a person who was not qualified by law to be a beneficiary does not ipso facto invalidate the entire policy.

It is, however, generally held that notwithstanding an incontestable clause, the insurer is entitled, after the expiration

of the contestable period, to defend on the ground of want of insurable interest if the policy otherwise would have been void for lack of insurable interest. (*Bromley* v. *Washington Life Ins. Co.*, 122 Ky. 402, 92 S. W. 17, 121 Am. St. Rep. 467, 12 Ann. Cas. 685, 5 L. R. A. (n. s.) 747; *Clement* v. *New York Life Ins. Co.*, 101 Tenn. 22, 46 S. W. 561, 70 Am. St. Rep. 650, 42 L. R. A. 247; *Anctil* v. *Manufacturers Life Ins. Co.*, 28 Can. S. C. 103.) And we have said that a fraternal insurance company may not waive existing statutory requirements governing its own conduct. (*Styles* v. *Byrne*, 89 Mont. 243, 296 Pac. 577.) Therefore, the incontestable clause does not prevent the company from raising the qualifications of the beneficiary at the time of the death of the insured to take under the policy. Admittedly, plaintiff was not qualified as a beneficiary at the time of the issuance and delivery of the policy; but if her common-law marriage with the insured is valid, then she was his wife at the time of his death, and occupied a degree of relationship with the insured which placed her within the class of persons who may be beneficiaries under section 6311, supra.

In the case of *Nitsche* v. *Security Benefit Assn.*, supra, a husband was named as beneficiary in a fraternal insurance policy on the life of his wife. Prior to her death they were divorced. There we held that he was not qualified as a beneficiary and could not receive the proceeds of the policy. In other words, the policy of insurance in that case at the death of the insured for the first time called for the husband of the deceased, and there was none to answer.

In the case of *Columbian Circle* v. *Auslander*, 302 Ill. 603, 135 N. E. 53, the insured had deserted a wife and family in New York state and removed to Chicago, where he resided illicitly with another woman whom he named as beneficiary in a fraternal insurance policy. Subsequent to the death of his wife he and his beneficiary in his insurance policy were married; thereafter he died. The court held that notwithstanding the beneficiary was not within the eligible list at the time of the issuance of the certificate, the policy did not fail for illegality. To the same effect is the case of *De Benio* v. *Catholic Order of*

*Foresters,* 194 Ill. App. 616. On another phase of this case the supreme court of Illinois in the *Auslander Case,* supra, expresses our views, as follows: "Appellees urge that to permit the appellant to take the fund in this case would be to sanction a fraud and immorality. This court, in passing upon the effect of this certificate of insurance, does not in any way approve the illicit relations existing between the insured and the appellant prior to their marriage. The rule which we believe should be adopted is not based upon any such conduct of the parties but upon the legal principles arising out of the facts."

Proceeding now to the consideration of the alleged common-law marriage: The plaintiff testified that after the death of Cushing she and Stevens were married by agreement. She said: "We were pledged to one another as man and wife. After that was done we continued living as man and wife. That was after I came back from Salt Lake in November." The evidence of many witnesses was introduced showing that plaintiff and the insured lived together as man and wife, were introduced as such, and referred to each other as man and wife; that accounts were charged at mercantile establishments to Mrs. Stevens; and that all of these various acquaintances, friends and mercantile establishments considered them as man and wife.

One of the disputable presumptions in this state is that a man and woman holding themselves out as husband and wife have entered into a contract of lawful marriage. (Sec. 10606, subd. 30, Rev. Codes; *Elliott* v. *Industrial Acc. Board,* 101 Mont. 246, 53 Pac. (2d) 451.) In the case last cited we said: "The so-called 'common-law marriage' is recognized as valid in this state, but, to be effective, there must be the mutual consent of parties able to consent and competent to enter into a ceremonial marriage, and the assumption of such relationship, by consent and agreement, as of a time certain, followed by cohabitation and repute." After the death of Cushing unquestionably the plaintiff was a person capable of marrying, and the evidence clearly supports the implied finding of the court within the rule supra. We are mindful, however, that the rule is that where the relations between a man and woman are illicit in their in-

142

ception and such a condition is shown to exist, it is presumed that their relations continue illicitly until the contrary is shown, and the burden rests upon the party asserting the validity of the marriage to show that the illicit relations changed to a lawful one by marriage. (*Shepherd & Pierson Co.* v. *Baker,* 81 Mont. 185, 262 Pac. 887; *Welch* v. *All Persons,* 78 Mont. 370, 254 Pac. 179.) The evidence, aside from this disputable presumption, is all to the effect that there was a common-law marriage between the plaintiff and the insured after the death of Cushing, and the trial court impliedly found that there was a common-law marriage. Ample evidence is found in the record to support such finding.

We, therefore, conclude that plaintiff was a qualified beneficiary at the time of the death of the insured and entitled to receive the proceeds of this insurance policy. Judgment affirmed.

Assocate Justices Morris and Angstman concur.

Mr. Justice Stewart:
I dissent.

Mr. Chief Justice Sands, Dissenting:

This case presents the question whether a common-law wife can recover on a policy of insurance issued by the defendant, Woodmen of the World, where the beneficiary was falsely represented as the first cousin of the insured.

The testimony and pleadings admit that the beneficiary, Marie Cushing Stevens, was married, first to Dr. Cordan some place in the eastern part of the United States; that he died; that about three years later she married Albert J. Cushing; that she and Cushing lived together as man and wife until 1931 when he died. About 1922 Albert W. Stevens came into the family, first as a boarder and then, according to the testimony of Mrs. Cushing, he assumed "the first place," and Mr. Cushing "was boarding with me." "Q. Who came first, Cushing or Stevens? A. Neither one, as far as that goes Mr. Stevens came first be-

cause he was *the man.*" This state of affairs continued until the death of Cushing, in 1931. In the meantime, in 1922 and while Mr. Cushing was still alive, Stevens made a will whereby he left all of his property to plaintiff. Cushing had an insurance policy for $2,100 in favor of plaintiff in the Woodmen of the World prior to Stevens' advent into the family. Stevens also took out a policy of insurance for $1,000 in the same society in 1922 in favor of plaintiff. When the agent came to the tri-family home to fill out the blanks for the Stevens insurance he inquired the relationship of the plaintiff to the applicant Stevens. Stevens told him that she was *only a friend,* and the agent thereupon on his own initiative designated her as a *cousin,* striking from the blank the insertion first made by him designating her otherwise, but, as the blank is so blurred, it is difficult to say what designation he did give her in the first instance. When the blank application reached the head office at Denver it was discovered that she had been designated only "cousin," and the constitution of the society in directing who may be beneficiaries excludes relatives more distant than the *"first cousin."* It would appear that thereupon a typewritten sheet was sent to the applicant in which Marie Cushing was specifically designated as the *"first cousin"* of Mr. Stevens, which statement was signed and transmitted back to the home office by Mr. Stevens and there attached to the application. This error and special correction would negative any claim that the erroneous designation was an oversight.

In 1928 the Woodmen of the World made some changes in its manner of doing business and a new application blank was filled out by Mr. Stevens and a new certificate issued to him, in which he again designated the plaintiff as his *first cousin.* After the death of Stevens, in 1932, the plaintiff undertook to probate the will of Stevens heretofore referred to. This proceeding was contested by some of the brothers and sisters of the deceased. This probate proceeding has apparently been abandoned there being no property in the estate. It is conceded the policy is not part of the estate. The plaintiff now relies solely upon the designation of herself as beneficiary in the insurance policy. It ap-

pears, however, that in 1932 plaintiff recovered about $2,100 at the death of Cushing under the policy of this defendant society issued on his life to the plaintiff, the beneficiary therein, as his wife.

The constitution and by-laws of the Woodmen of the World both at the time of the issuance of the first policy to Stevens, and also when the substitute policy was issued, designate very specifically the relatives who were permitted to become beneficiaries under the society's policies. Beyond question this plaintiff was not related to Stevens and was not competent to become a beneficiary when the policy, and also the renewal thereof in 1928, was issued to Stevens.

The constitution of the Woodmen of the World provides: "A benefit certificate can only be made expressly payable to, and the payment of all death benefits shall be confined to, some person or persons named, who sustained to the holder the relationship of either wife, child, adopted child, grandchild, parent, parent by adoption, grandparent, brother, half-brother, sister, half-sister, nephew, niece, uncle, aunt, son-in-law, daughter-in-law, brother-in-law, sister-in-law, mother-in-law, father-in-law, step-father, step-mother, step-child, first cousin * * * . In case an applicant for membership so desires, he may direct that the benefit in his certificate be made payable to the beneficiaries designated in the Constitution of the Association, and his benefit certificate shall so provide, or in case a beneficiary expressly named in a benefit certificate does not survive the holder thereof and the Neighbor has failed to designate a successor thereof, as provided in sec. 103, then in such cases the amount which would have gone to such named beneficiary, if surviving, shall be disbursed in like manner, which shall be in the following order: first if the deceased Neighbor leaves a widow and no child, or grandchild, to his widow; * * * ." (Sec. 103, Constitution, W. O. W., Fifteenth Head Camp Session, June 25 to July 2, 1928.)

The plaintiff claims that the false relationship was inserted in the policy with the full knowledge and connivance of the representative of the insuring society and, therefore, it had full no-

tice of the fraud and is estopped from denying responsibility on that account. The defendant disputes this conclusion and an issue here arises from such situation. Plaintiff claims now to be entitled to take as the widow of Stevens, and not as his cousin, the designation as designated in the policy. She was fully qualified to become the wife of Stevens after the death of Cushing which occurred about a year prior to the death of Stevens. Much testimony appears to establish the fact that Stevens and this plaintiff lived together as husband and wife and held themselves out as such after the death of Cushing. There is also much testimony that Stevens and plaintiff did hold themselves out as husband and wife *prior* to the death of Cushing, and it is also equally well established, in fact admitted by plaintiff, that she lived with Stevens in a state of concubinage for several years, possibly ten, prior to the death of Cushing. Just what was Cushing's attitude respecting the relations of Stevens and plaintiff does not appear and is probably not very material in view of the conclusions we reach herein. Apparently he was on very friendly terms with the plaintiff and perhaps also with Stevens.

Mrs. Stevens testified that she and Stevens took Cushing's body to Salt Lake for burial, and she asserts that she and Stevens were married shortly thereafter, but without ceremony and apparently merely by the continuance of their illicit intercourse and manner of living. In the case of *Thomas* v. *Clay*, 120 Miss. 190, 197, 82 So. 1, 2, the court said: ''The relation being illegal in its inception and void for want of capacity in Ben Clay to contract the marriage, it must be presumed in the absence of proof to the contrary that the relation continued after the death as before. If there was an agreement after the death of Polly Johnson Clay between Virginia and Ben Clay it must be proven.'' The instant case differs from that case in that plaintiff testified that she and Stevens were married by their mutual promises without witnesses, in the manner stated, and the testimony is not seriously refuted that after their return to Montana they did hold themselves out as husband and wife. The puzzling question then before us is, Did the removal of the disqualification of the plaintiff by the death of Cushing a year

previous to the death of Stevens qualify the plaintiff as a common-law wife to become a proper beneficiary in the Stevens policy, and did she thereupon become a beneficiary solely by virtue of such relationship without specific designation of her by Stevens as his wife after having been fraudulently named first cousin in the policy as a beneficiary?

The improper designation of the plaintiff in the Stevens policy as a first cousin of deceased was a fraud upon the insurance society and a misrepresentation prohibited by the constitution of the Woodmen of the World, a fact known to both Stevens and the agent of the society who took his application. In other words, it was a conspiracy of Stevens and such representative. Inasmuch as the policy was in the possession of the plaintiff long prior to the death of Stevens, and she testified that she paid most of the premiums and she had the policy in her possession most of the time, wherein on its face she is plainly designated as first cousin, and it further appearing that she was present when the application was signed, we may assume that she was not ignorant of this conspiracy. The fraud of Stevens and the solicitor is well established. The complaint directly alleges the fact that plaintiff was not the first cousin of Stevens; therefore the fraud is undisputed. There is no evidence that other officers or agents of the society knew of the fact that plaintiff was in no legitimate way related to Stevens at the time of the issuance of the policy or at any time before the death of Stevens. The question then arises whether the guilty knowledge of the agent is applicable and binding on the issuing officers of the defendant insurance society. The plaintiff relies upon that proposition to establish her case.

The constitution of the society is specifically made a part of the policy. It definitely limits the authority of its officers to the issuance of policies naming only as beneficiaries *relatives* of stated degrees or dependents. Strangers to the blood of the applicant, other than dependents, are clearly prohibited. If the death of Cushing, the husband of the beneficiary, qualified her to then become the wife of Stevens, could such change of circumstances revive the policy in *her* name as his wife? This

woman had a living husband whom she discarded for Stevens—· at least she says Stevens assumed "first place," and her legitimate husband, Cushing, became a "boarder." She passed as "Mrs. Cushing" and also as "Mrs. Stevens." She collected $2,100 insurance on Cushing's life as his wife in 1931, nine years after the Stevens policy was issued. Stevens helped in a large measure to spend this Cushing insurance money as the common-law husband of plaintiff. He was earning nothing at the time of his sudden death. She had no apparent motive to encourage his living. She was the beneficiary in his will. She apparently thought she was doubly sure of acquiring whatever wealth Stevens possessed at his death.

At the time of negotiating for the policy the applicant, Stevens, in accordance with the established policy of the society, received and receipted for a copy of the constitution of the society, so that he became charged thereby with knowledge of the limitations respecting the persons who might be named as beneficiaries. All this was in addition to the other information furnished him by the agent in such respect. This disposes of one of the chief contentions of plaintiff's brief—that is, that Stevens was not charged with notice of the provisions of the constitution so long as he was not a member of the society when he made the application to join and to become insured. The constitution of the society, sections 3 and 103, very definitely specified the parties who could become beneficiaries, and Marie Cushing was not in that class when the policy was issued. She was, therefore, definitely excluded from the list of qualified beneficiaries under the rules of the society.

The defendant Woodmen of the World was organized under the laws of Colorado. The statutes of that state limit the right of organizations of this character to name as beneficiaries only blood relatives and dependents—similar to the constitution of this society. (Colorado Statutes, Mills Code, sec. 2604.) That limiting statute would govern here. (45 Cyc. 171, R. C. L. 1280; 2 Couch on Insurance, 818; 45 C. J. 176.) In addition, the law of Montana (sec. 6311, Rev. Codes) prohibits the payment to beneficiaries by such societies other than blood relatives

or dependents. (*Nitsche* v. *Security Benefit Assn.*, 78 Mont. 532, 539, 255 Pac. 1052; *Styles* v. *Byrne*, 87 Mont. 243, 253, 296 Pac. 577.) These cases hold that payment could be made to a party qualified where the prohibition did not apply at the time the contract was made.

The attempted contract of insurance payable to an unauthorized person was absolutely void for the reasons: First, because it violated the constitution of the insuring society in naming an unqualified person as beneficiary; second, it violated the laws of Colorado; and third, it violated the laws of Montana, either one of which was vital under the undisputed circumstances here. There was here a contract void when attempted, for want of a proper beneficiary. No attempt was made by Stevens to name anyone else as beneficiary. The law might shift the beneficiary, as was done in the case of *Styles* v. *Byrne*, supra, but there must first be a valid contract before there can be a substitution. This contract was induced by fraud and contrary to public policy. The contract to favor a concubine, especially under the circumstances established here, would not be approved by this insurance society nor by any court, once the true facts were known. Such fraud could not be successfully waived or obviated by any party whatsoever. Public policy and the statutes forbid.

A contract unlawful when made is void by common law and probably by the statutes of every state in the Union. The Montana statutes are as follows: "Sec. 7498. The object of a contract is the thing which it is agreed, on the part of the party receiving the consideration, to do or not to do." "Sec. 7499. The object of the contract must be lawful when the contract is made, and possible and ascertainable by the time the contract is to be performed." "Sec. 7501. Where a contract has but a single object, and such object is unlawful, whether in whole or in part, or wholly impossible of performance, or so vaguely expressed as to be wholly unascertainable, the entire contract is void." "Sec. 7502. Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and

valid as to the rest." (*Equity Co-operative Assn.* v. *Equity Co-op. Milling Co.,* 63 Mont. 26, 206 Pac. 349.) "If false or fraudulent representations were held out to the plaintiff as an inducement to the execution of the notes in suit upon which he acted, and in consequence of which it was imposed upon or on account of which the notes were executed and delivered, the obligation becomes a nullity. (*Lahood* v. *Continental Tel. Co.,* 52 Mont. 313, 157 Pac. 639.) In the case of *Glass* v. *Basin & Bay State Min. Co.,* 31 Mont. 21, 31, 77 Pac. 302, this court held a contract to appoint a person a director of a corporation beyond the time fixed in the statute, is unlawful and void and it denied enforcement.

So much controversy and so much importance depend upon the question whether this policy was void or voidable that I now give special consideration to that feature of the case. It is not questioned that if the contract was *void,* as distinguished from voidable, the policy cannot be enforced. I refer particularly to the definition of these words in 67 C. J., beginning on page 263 under the titles "Void" and "Voidable": "Primarily, the word [void] implies an act utterly of no effect and incapable of ratification, and in its most limited sense, implies an act of no effect at all, and a nullity, *ab initio.* In one sense, and perhaps in the strictest and most accurate conception of its meaning, 'void' involves an idea of utter ineffectiveness in all situations and for all purposes, leaving the effect of the void transaction the same as if it had not taken place. 'Void' things are no things in legal effect. Nothing can be founded on what is absolutely 'void.' Generally speaking, a 'void' act is *incurable, and is wholly without force or effect as to all persons and for all purposes and incapable of being or being made otherwise.* A 'void' act is one which is entirely null, not binding on any party, and not susceptible of ratification or confirmation; and its nullity cannot be waived. A thing is 'void' which is *done against law, at the very time of doing it, and where no person is bound by the act.* A 'void' act usually denotes an inherent defect or vice, usually relates to *public transgressions,* and usually refers to a *fundamental public policy.* Things may

be 'void' as to some persons and for some purposes, and, as to them, incapable of being otherwise, which are yet valid as to other persons, and effectual for other purposes.''

''That is absolutely void which the law or the nature of things forbids to be enforced at all, and that is 'relatively void' which the law condemns as a wrong to individuals, and refuses to enforce as against them.'' The law in this instance forbids; therefore it is void. The case of *Metropolitan Life Ins. Co.* v. *Halcomb,* 79 Fed. 788 (decided in 1935) contains this language: ''The California supreme court has determined in a series of decisions that no contract can be created by an attempted agreement for the services of a person required to be licensed under California laws for the protection of the person to be served, nor implied from a request for the acceptance of such unlicensed services. There is no distinction between services *malum in se* and *malum prohibitum* when an express statute is involved. *Such contracts are not voidable but entirely void.* This contract was prohibited by statute. 'Void' will be construed in the sense that will best effectuate the intent in its use, which will be determined from the whole of the language of the instrument and the manifest purpose it was framed to accomplish.'' This contract became void when a beneficiary, not qualified, was atttempted to be named as such. (*Swanger* v. *Mayberry,* 59 Cal. 91.)

In *Ladda* v. *Hawley,* 57 Cal. 51, where the owner of a government homestead before patent sold the timber growing thereon contrary to a federal prohibition, the court held that the contract was void when made and recovery for the timber cut before patent was denied. ''In general, it seems that where an enactment has relation only to the benefit of particular persons, 'void' will be understood as 'voidable' only, at the election of the persons for whose protection the enactment was made, provided they are capable of protecting themselves; but that when 'void,' as used in such enactment, relates to persons not capable of protecting themselves, or when it has some object of *public policy* in view, which requires the strict construction, 'void'

will receive its natural, full force and effect; that where 'void' is used to secure a right to or *confer a benefit on the public,* it will, as a rule, be held to mean null and incapable of confirmation.''

''The word 'voidable' means capable of being avoided or confirmed; that which has some force or effect, but which may be set aside or annulled for some error or inherent vice or defect. Things are 'voidable' which are valid and effectual until they are avoided by some act.'' This contract was not capable of being avoided when made or for many years thereafter.

''A thing is 'void' which is done against law, at the very time of doing it, and where no person is bound by the act.'' ''A contract which contemplates the doing of a thing which is unlawful at the time of making thereof is void.'' (*Baltimore Process Co.* v. *Red Lodge B. Co.,* 66 Mont. 407, 213 Pac. 798.)

''Void'' as distinguished from ''voidable,'' acts are of no legal effect. Another test of a ''void'' act or deed is, that every stranger may take advantage of it, but not of a ''voidable'' one. What is ''void'' can always be assailed in any proceeding; what is ''voidable'' can be assailed only in a direct proceeding instituted for that purpose. The distinction, therefore, in regard to the consequences to third persons, is highly important, for nothing can be founded on what is absolutely ''void,'' whereas from those deeds which are ''voidable'' only, fair titles may flow. Generally, a ''void'' act is incurable; a ''voidable'' act may be cured by passivity, ratification or acquiescence. A ''void'' act usually refers to a *fundamental public policy;* but a ''voidable'' one is more often procedural. The former usually relates to a *public transgression,* the latter to a private wrong.'' (67 C. J. 265.)

The statute of Montana (sec. 7499) making an unlawful act *void* when made, fits this case exactly. This policy payable to a stranger was void under section 6311, because founded on public policy—the objection to payment to any persons not having an insurable interest in the life of the person insured. By section 7499 the validity of the contract must be measured as of the *time when made.* Marie Cushing was not at such time

a qualified beneficiary; therefore, the policy was void—not voidable. Note that this section definitely specifies that the object of the contract must *"be lawful when made."* This contract was like a stillborn babe—born dead. It was void *ab initio.* "Where a contract has but a single object, *and such object is unlawful."* (Sec. 7501, supra.)

If the only object of this contract was the insurance, the *entire* contract was void; but if the further object was the privilege of the society, then section 7502 would apply. No doubt exists that the insurance contract was void *at its inception* by the laws of Montana when it is sought to be enforced, and also by the laws of Colorado under which the insuring society authorized the policy. In the case of *Glass* v. *Basin & Bay State Min. Co.,* supra, where a corporation sold its property upon a consideration that certain officers of the retiring corporation should continue in office for a period of at least three years—a period beyond that allowed by the statutes, this court said in part: "They characterize these acts of defendant as being in violation of the contract and as wrongful. The following language from the opinion in *Williamson* v. *Chicago, R. I. & P. R. R. Co.,* 53 Iowa, 126, 4 N. W. 870, 36 Am. Rep. 206, is pertinent here: 'In this case the plaintiffs have fully performed the contract on their part. On their side the contract has been executed. The action is not brought in disaffirmance of their contract. Upon the contrary, they allege a full performance of the contract upon their part, and a breach of the contract upon the part of the defendant. It is upon this breach that they predicate their right to recover. Their action is upon the contract. * * * We feel fully satisfied that for a breach of the contract, as alleged and proven, no damages are recoverable.' The facts in the case from which we have just quoted were that the plaintiffs procured the conveyance to the defendant of certain lots in the city of Des Moines upon consideration of a promise by defendant that it would build thereon passenger and freight depots, which should be the only ones built or maintained by it in said city. Defendant built and maintained both passenger

and freight depots thereon, but, having also built a depot in another part of the city, an action was brought by plaintiffs to recover, as damages, the value of the lots conveyed. It was held that such action was based upon the contract, which was illegal and void as against public policy, and, the parties being in equal fault, the action could not be maintained. From the facts stated in the complaint before us, the parties, in making and carrying out the contract, which seems to have been fully executed by plaintiffs, and performed by defendant for over four years, were equally at fault. Therefore the maxim that 'as between those in equal fault, the possessor's case is the better,' applies in all its force. (See *Setter* v. *Alvey,* 15 Kan. 157; *Bagg* v. *Jerome,* 7 Mich. 145; *Knowlton* v. *Congress & Empire Spring Co.,* 57 N. Y. 518; *Meyers* v. *Meinrath,* 101 Mass. 366, 3 Am. Rep. 368; *Spalding* v. *Bank,* 12 Ohio, 544; *Tyler* v. *Smith,* 18 B. Mon. (Ky.) 793; *Hill* v. *Freeman,* 73 Ala. 200, 29 Am. Rep. 48.) The general rule is thus stated by Lawson in 9 Cyclopedia of Law & Procedure, commencing on page 546: 'No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out, nor can he set up a case in which he must necessarily disclose an illegal purpose as the groundwork of his claim. The rule is expressed in the maxim *'Ex dolo malo non oritur actio,'* and *'In pari delicto potior est conditio defendentis.'* The law, in short, will not aid either party to an illegal agreement. It leaves the parties where it finds them. Therefore, neither a court of law nor a court of equity will aid the one in enforcing it, or give damages for a breach of it, or set it aside at the suit of the other, or, when the agreement has been executed in whole or in part by the payment of money or the transfer of other property, lend its aid to recover it back.' It is unnecessary to cite authorities in support of this text.''

The contract in this case is controlled in favor of defendant, if not otherwise, by section 7498, supra. The object of this contract was not only contrary to the purposes of the society and contrary to public policy, but positively prohibited by statute and made a misdemeanor therein.

Much time was spent in the briefs respecting the paragraph of the policy wherein it is provided that the policy shall become incontestable after one year. In view of our holding that the policy was void *ab initio* the contestable issue is of no consequence. However, it is well to repeat the statement that fraud is a matter of public policy which the parties cannot waive. The confusion arises from the consideration of cases wherein mistakes arose not chargeable as fraud on the part of the assured, and other instances where the insurance company waived its privilege to contest and did not base its refusal to pay on the ground of fraud, *Columbian Circle* v. *Auslander*, 302, Ill. 603, 135 N. E. 53, does not warrant the court of its own motion to inject into the case the question of fraud as a ground for declaring such invalidity. In this case, the fraud of all the parties, except the society, is so glaring and flagrant, that this court, in the face of the objection of the insurance society, could not excuse itself from nullifying the contract and obstructing the parties actively participating in the fraud from profiting thereby through their own wrong.

In *Bush* v. *Modern Woodmen,* 182 Iowa, 515, 533, 152 N. W. 31, 162 N. W. 59, the court said: *"But where, as in this case, an act is prohibited by statute, the contract is illegal and void,* and cannot be enforced. The rule as stated by Taylor in his work on Corporations (section 299) is as follows: 'If a statute expressly prohibits a corporation to make a certain contract, the contract is void, even though not expressly declared to be so, and is incapable of ratification; and that the contract is void, as unlawful, may be pleaded by anyone to an action founded directly and conclusively on such contract; unless (1) the statutes expressly state what the consequences of violating it shall be, and those consequences are other than the contract, shall be void; or (2) unless the statutory prohibition was evidently imposed for the protection of a certain class of persons, who may alone take advantage of it; or (3) unless to adjudge the contract void and incapable of forming the basis of a right of action would clearly frustrate the evident purposes of the prohibition itself.' (*Lucas* v. *White Line Transfer Co.,* 70 Iowa,

541, 30 N. W. 771, 59 Am. Rep. 449; *Krause* v. *Modern Woodmen*, 133 Iowa, 199, 110 N. W. 452; *Modern Woodmen* v. *Comeaux*, 79 Kan. 493, 101 Pac. 1, 17 Ann. Cas. 865, 25 L. R. A. (n. s.) 814.) This was an action on a certificate issued to one who was not eligible, under the law, to become a beneficiary. As to the plea of waiver, the court therein said: 'The plaintiff further claims that the clerk of the local camp, to whom assessments were paid, knew the relations between plaintiff and the deceased, and that the receipt by him of the assessments after the change in the name of the beneficiary amounted to a waiver of the fact that plaintiff did not belong to the class of persons who could be made beneficiaries. There are many things that can be waived by an association of this character, but this is not one of them. The statute expressly and positively prohibits the payment of benefit fund to any person who is not within the class designated as beneficiaries. This law cannot be repealed by the conduct of the clerk of a local camp.' "

The fiction of a common-law marriage was invented to protect innocence, such in particular as children of parents careless of the proper demands of society. Extension of this fiction should be carefully guarded. The presumption of a common-law marriage should be assumed only upon well-established proof measured strictly by the principles of equity and justice.

It has been earnestly suggested that the rights of the beneficiary do not accrue until the death of the insured, and that the insurance contract must be measured by the conditions then existing. Much stress has been placed upon the case of *Columbian Circle* v. *Auslander*, 302 Ill. 603, 135 N. E. 53. That case held that where a married man presumed to marry a woman, his wife's sister in fact, and took out a policy in her favor on the life of his wife, the legal wife dying first, the assured thereafter married the woman with whom he had been living and had the policy issued in her favor. The second wife attempted to collect on the policy and the child of the first wife intervened. The insurance company placed the money in the hands of the court and left the controversy between the widow and the heir. The

case is distinguishable from this case in that here the insurance company is denying the validity of the policy. In the cited case there was no controversy over such validity. The court there said: ''Whether or not such certificate might have been void as a fraud upon the society does not arise here as it has paid the fund into court and has waived any question of fraud against it,'' citing *Woodmen of the World* v. *Rutledge*, 133 Cal. 640, 65 Pac. 1105; *Cowin* v. *Hurst*, 124 Mich. 545, 83 N. W. 274, 83 Am. St. Rep. 344; *Tepper* v. *Royal Arcanum*, 61 N. J. Eq. 638, 47 Atl. 460, 88 Am. St. Rep. 449. Further difference arises as appears from the following quotation from the same case: ''Section 257 of the by-laws of the society provides that if at the time of the death of a member who has designated as beneficiary a person of the second class and the dependency required shall have ceased, or if any designation of beneficiary shall fail for illegality or otherwise, then the benefit shall be payable to the person or persons mentioned in class 1.'' The case cited therein—the decision of an inferior court—seems to be squarely in point, but is all included in one short paragraph, and the conditions are not clearly and fully stated; therefore too much weight should not attach to it. True the rights of the beneficiary in a valid policy are not fixed and determined until the death of the insured, but they are, when finally considered, measured by the conditions existing when the contract was made. The provisions of the contract are merely dormant and subject to alteration during the lifetime of the insured if the contract is lawful when made.

If the policy was legal when made, it might become illegal under changed conditions, but if *unlawful when made* it cannot spring into life upon the happening of conditions that annul the prohibitions against it when made. Section 7499, supra, settles that proposition. It says the contract must be *lawful when made*. The contract is not *made* at the death of the insured. (See, also, *Baltimore Process Co.* v. *Red Lodge Co.*, 66 Mont. 407, 213 Pac. 798.)

But there is a further reason why this judgment should be reversed. Stevens could not lawfully name the plaintiff as bene-

ficiary when the policy was issued. Her counsel does not claim he could. The law does not declare the widow a beneficiary except under certain circumstances. The provisions of the constitution of the society of 1928 pertaining to this subject are contained in section 103: "A benefit certificate can only be made expressly payable to, and the payment of all death benefits shall be confined to, some person or persons *named,* who can sustain to the holder the relationship of either wife, child," etc. In case an applicant for membership so desires, *he may direct* that the benefit in his certificates be made payable to the beneficiaries designated in the constitution of the Association, and his benefit certificate shall so provide, or in case a beneficiary expressly named in a benefit certificate does not *survive the holder thereof and the Neighbor has failed to designate a successor thereof,* as provided in sec. 103, then in such cases the amount which would have gone to such named beneficiary, if surviving, shall be disbursed in like manner, which shall be in the following order: first if the deceased Neighbor leaves a widow and no child or grandchild, to his widow; * * * ."

It will be observed that the law names the widow only in cases where the beneficiary "does not survive the holder thereof." Such condition is not present in this case, as the named beneficiary survived the holder of the certificate. She must take under the policy as the Marie Cushing, the *cousin,* if at all—not as the *widow* of Stevens. We cannot eliminate the provision in the constitution that the named beneficiary *be dead* before the alternative provision designating the widow becomes effective.

Stevens lived a year after plaintiff became his common-law wife. He could then have had her named as his lawful beneficiary, if in fact he was her husband, but he did not notify the society that he had joined the lodge by a false representation and that he wanted to now insert "wife" for "first cousin." Having neglected to avail himself of the privilege granted by the policy, shall the court assume the duty of naming the beneficiary? No privilege or duty of that character appears in the policy or in the law. Shall we go beyond our jurisdiction to

protect this confessed harlot? (*West* v. *Grand Lodge*, 14 Tex. Civ. App. 471, 37 S. W. 966.) "The courts never lend themselves to the enforcement of contracts which are in violation of law and repugnant to public policy." The policy, par. 4, sec. 102, provides: "If any of the statements or declarations in the application for membership on the faith of which a certificate is issued shall be found, in any respect, untrue, then in said case such certificate shall be null and void, and of no effect, and all money which may have been paid, and rights and benefits which otherwise might have accrued on account of such certificate, shall be absolutely forfeited." Two other paragraphs of the constitution are to the same effect. Can we disregard these definite statements of the contract?

I have recited the facts as they appeared in the record and considered the law thereon without reference to the issues presented by the pleadings. I reverse the usual order and now consider the case from that standpoint. The complaint recites the issuance of the policy, the representation by Stevens that this plaintiff, Marie Cushing was his first cousin, and that the representation and allegation vital to the cause of action were false. The defendant filed a general demurrer, which was overruled. The complaint was insufficient by showing on its face that there was no lawful beneficiary named by the insured when the policy was issued, and therefore the contract was void on its face when read in connection with the admissions of the complaint. See section 6311, supra, limiting the persons who could be named beneficiaries, and section 7499: "The object of the contract must be *lawful when the contract is made*." (*Corey* v. *Sunburst Oil & Gas Co.*, 72 Mont. 383, 390, 233 Pac. 909.) The demurrer should have been sustained, and the district court should be directed to dismiss the action.

Appellant having filed petition for rehearing, the matter was, on July 9, 1937, set for argument on September 23, 1937, at which time the questions presented were reargued by counsel for both parties. Rehearing denied October 11, 1937. MR. CHIEF JUSTICE SANDS and MR. JUSTICE STEWART dissenting.